FILED

JUN - 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

SANDEEP DALAL
Plaintiff, 2111 Wisconsin Ave. N.W.
            W.D.C. 20007
            202.342.1205

v.

Goldman Sachs & Co.
Defendant.

---

CASE NUMBER 1:06CV01061

JUDGE: Emmet G. Sullivan

DECK TYPE: Contract

DATE STAMP: 06/●/2006

## STATEMENT OF CLAIM

### THE PARTIES

1. Sandeep Dalal ("Mr. Dalal") is a thirty-seven year old individual who is domiciled at 2111 Wisconsin Avenue, NW, Washington, DC 20007.

2. Mr. Dalal has a bachelors' degree in Economics (Honors) from St. Stephen's College (University of Delhi), India, a masters' degree in International Banking & Finance from Columbia University, New York and a masters' in business administration degree from Harvard Business School, Boston.

3. Mr. Dalal's background at the time of joining Goldman Sachs included employment at the investment bank of Lehman Brothers Inc., based in New York City, and work at Bain & Company, in strategy consulting. Upon leaving the company, he joined Core Capital Partners, a Delaware Limited Partnership, where he was Vice President, and subsequently joined India.com, a New Jersey corporation/ Internet Company of India Pvt. Ltd., an India corporation, where he was President.

4. While Mr. Dalal is a resident of Washington, DC, he has been a resident of New York City for a total of eight years, between 1989-1994 and 1996-1999.

5. Goldman Sachs & Co. ("Goldman Sachs") is a corporation that operates in multiples cities and countries around the world, and has its head office at 85 Broad Street, New York, NY 20004.

## SUMMARY OF CLAIM

6. Mr. Dalal is the prevailing party in a dispute arbitrated by an arbitration panel of the New York Stock Exchange ("NYSE"), but which award of $25,000 fails to reflect the undisputed current market value of $318,000 of the stock in Goldman Sachs, which stock was awarded to Mr. Dalal for past services and which made no requirement of continued employment.

7. The NYSE arbitration panel was seated in the District of Columbia and conducted all proceedings in the District of Columbia. All three members appointed to the arbitration panel, namely Ms. Stephanie Malevich (industry representative), Mr. Dennis McLeavy (public representative) and Mr. Morris Levin (panel chairperson), were drawn from a list of arbitrators resident in the vicinity of the District of Columbia and therefore selected for local disputes only.

8. The arbitration case was designated as #2004-015821 *Sandeep Dalal v. Goldman Sachs.*

9. The first arbitration award was dated November 25, 2005 (delivered via letter on or about December 6, 2005). The cover letter to the first award promised a second award, which was to clarify issues of confidentiality. The second award

2

was issued on or about January 20, 2006. Mr. Dalal properly brought forth a motion for modification of the award on February 8, 2006. The motion was dismissed without modification pursuant to a third award, dated March 9, 2006, postmarked March 10, 2006 and likely received by Mr. Dalal no earlier than March 12, 2006.

10. The third award was signed by an employee of the NYSE, and thus remains unsigned by the arbitration panel. As such, per case precedents, a final award has not yet been issued by the NYSE. Out of abundant caution however, Mr. Dalal most humbly brings this appeal to the Federal Court for the District of Columbia.

## SUMMARY OF FACTS

### *Introduction*

11. On April 1999, Goldman Sachs awarded Mr. Dalal Formula Restricted Stock Units, doing so in recognition of past services to all employees, and in anticipation of the initial public offering of the company's stock (the "IPO Award").

12. The company completed its initial public offering on the New York Stock Exchange on May 4, 1999.

13. Dalal's employment with Goldman Sachs ended on August 27, 1999, at which time Dalal accepted employment as Vice President of Core Capital Partners, a Small Business Investment Company ("SBIC") located in Washington, DC ("Core Capital"). In 2000, Dalal accepted a new job, as President of

India.com, an information technology and dotcom business based out of the United States and India.

14. Goldman Sachs preliminarily wrote to Dalal on June 5, 2000, informing him of termination of the IPO Award. After exchanges of letters, in accordance with the process required by the IPO Award, Goldman Sachs confirmed the same via a letter dated January 23, 2002.

15. The sole basis for termination of the IPO Award was Goldman Sachs' claim that Dalal had "engaged in competitive activity," making the awkward claim that a small $100 million SBIC in Washington DC was a competitor to a giant $50,000 million financial conglomerate with global operations.

16. Dalal disagreed. Goldman Sachs had granted the IPO Award in recognition for services performed by him in the past. Top management had additionally, personally assured Dalal that he would be able to retain his IPO Award upon his departure from Goldman Sachs, noting the fact that he had done virtually all the work for one year, that in a group with twenty-five other associates like himself. In any event, Dalal was an employee of the company on the date of the initial public offering, remaining so well past that date.

17. Mr. Dalal was obligated by contract to wait until Goldman Sachs itself green-lighted any arbitration proceeding, which did not occur until three years later. Mr. Dalal believes that with the passage of time, the company's high profile IPO was in the past, political strife within the organization (which cost the CEO his job) had subsided, the public relations risks of employee disputes had

4

receded and the value of Dalal's goodwill having disappeared, Goldman Sachs reneged on its written and oral contracts.

18. Upon an exchange of letters setting forth Mr. Dalal's perspective, he became eligible for the first time in arbitration in mid-2002. Mr. Dalal submitted the dispute to the NYSE in mid-2004.

19. The facts set forth by Mr. Dalal's Statement of Claim made eight key arguments why his IPO Award was arbitrarily terminated (1) without regard to specific facts (which evidenced that Dalal's subsequent employers were not a Competitive Enterprise); (2) without basis in written terms and conditions (which placed three incremental contractual hurdles before any termination became permissible, and which three hurdles remained unmet); (3) without regard to oral contracts (which promised that Mr. Dalal would be permitted to retain the IPO Award even if he were to join a competitor), which oral contract was corroborated by handwritten notes of a Goldman Sachs managing director that were provided to Mr. Dalal at discovery; (4) without regard to written assurances (which explicitly described the IPO Award as vested stock, that is given for past services, not future commitments); (5) without regard to conflicts among contradictory provisions of the contract (which further belied Goldman Sachs' conclusion); (6) without regard to the fact that the *de facto* non-compete agreement violated the reasonableness doctrine of New York law; (7) without commitment to the covenant of good faith and fair dealing implicit in all contracting; and (8) without regard to a quantum meruit claim for work

5

personally performed by Mr. Dalal, which work constituted virtually all the work done by a group that had over 25 other associates.

20. Consistent with NYSE Arbitration Rules, Mr. Dalal requested a reasoned and written decision, and per the terms and conditions of the contract with Goldman Sachs, requested confidentiality with regard to all filings made in this matter. Although Mr. Dalal reiterated those requirements prior to any award, and was supported in his request by NYSE Arbitration Rules, the arbitration panel failed to provide the reasoning for its award. Oddly enough, the arbitration panel openly encouraged Goldman Sachs' improper, pretextual and unlawful breaches of confidentiality.

**Summary Of The IPO Award**

21. The IPO Award was made for past services performed as an employee of Goldman Sachs, not for future services or for continued employment after the IPO date. That was clearly established on page three of the IPO Award Summary (which was submitted as Exhibit A of the Statement of Claim). Furthermore, page three of the IPO Award Summary goes onto to clarify that the stock was fully vested on the IPO date. Neither the staggered delivery schedule of the IPO Award nor Goldman Sachs' subsequent desire to deny Dalal his stock can detract from the indisputable fact that the economic value being arbitrated constituted a right already duly earned and a compensation past due.

22. Given that fact, the contract was subject to specific doctrines developed by New York courts under New York Law, doctrines such as the 'reasonableness

doctrine' and 'employee choice doctrine,' which are intended to prevent an improper termination of vested stock.

23. Dalal's first argument was that his subsequent employer was not a competitor at all, investing in the smallest-of-small-capitalization companies in the early stages of growth, principally in technology and technology-impacted businesses, unlike Goldman Sachs, which is synonymous with mega-capitalization companies. Mr. Dalal's employer (1) acted as principal in all its transactions, unlike Goldman Sachs, where Mr. Dalal was an agent, (2) invested capital for itself in amounts no more than $1-2 million at a time, unlike Goldman Sachs, which invests hundreds of millions at a time, (3) provided venture capital for small companies with no revenues and no profits, a business Goldman Sachs does not even participate in, (4) focused on companies in technology and other high growth sectors versus non-technology and slow growth sectors, (5) dealt with companies with no debt rather than significant amounts of debt, (6) invested in companies that were unprofitable and often without revenues rather than ones with stable revenues and high free cash flows and (7) companies that were focused in the mid-Atlantic states rather than globally. Furthermore, Mr. Dalal's subsequent employer was governed by the Small Business Administration, which Goldman Sachs is not even qualified to act as.

24. Mr. Dalal's second argument was that, in any event, the IPO Award made clear that it is not sufficient to find that Dalal worked for a Competitive Enterprise. That is merely a necessary condition. Dalal's employment had to

additionally have been work that was "similar or substantially related" to the work performed by Dalal in the last twelve months of his tenure at Goldman Sachs, work for which Dalal had "supervisory responsibility" in the last twelve months of his tenure at Goldman Sachs and work that required the "same or specialized skills" as those used by Dalal in the last twelve months of his tenure at Goldman Sachs.

25. At trial Goldman Sachs made no attempt to prove that any of the three conditions were true and failed to contest with facts Dalal's argument that those three were not. By contrast, Mr. Dalal showed how his subsequent employer did not engage in any activity that overlapped with Dalal's work in the last twelve months of Dalal's tenure in the high yield and leveraged finance group of Goldman Sachs. Mr. Dalal also showed that he did not have "any direct or indirect managerial or supervisory responsibility at the Firm." Finally, the products, procedures, processes and people at his subsequent employer had nothing to do with the high yield and leveraged lending businesses in which Mr. Dalal focused at Goldman Sachs.

26. In sum, neither the necessary nor the sufficient condition applied, and which thus prohibited Goldman Sachs from terminating the IPO Award. It was an incredulous suggestion that the same skills may be required for contexts as disparate as investment banking versus venture capital; or non-technology versus technology industries; or risk aversion versus risk taking; or fee-based underwriting as an agent versus profit-based investing as a principle; or work

where $75-100 million is the minimum threshold versus work where $1-2 million is the norm.

27. Mr. Dalal also introduced email evidence showing how he had a cooperative relationship with Goldman Sachs upon his departure, not a competitive one, including emails to the senior most staff of the firm, which clearly demonstrated how he had forwarded investment ideas to Goldman Sachs.

28. Mr. Dalal's third argument was that he sought and received assurances on three separate occasions from a Partner as well as a Managing Director of Goldman Sachs, who both assured Dalal that the IPO Award would not be terminated. Although Dalal decided not to join a competing investment bank, those oral contracts clearly precluded Goldman Sachs from applying the termination provision. Goldman Sachs' breach of oral contracts thus defrauded Dalal of an opportunity to make whole his loss and denied him the benefit of his bargain.

29. Goldman Sachs' fourth argument focused on Goldman Sachs' breach of written assurances, those given to him over and above the contract governing the IPO Award. Goldman Sachs now belatedly seeks to turn the IPO Award from being vested stock into unvested stock (which violates written assurances), or to turn it into a non-compete agreement (which violates New York law, which has twin doctrines of reasonableness and employee choice), or leave the preamble of

the Agreement in contradiction with the terms of that same Agreement (which is picked up in the next argument).

30. Mr. Dalal's fifth argument focused on the contradictory language of the contract itself, which suggested that the application of well-established principles of contract construction require that the aforementioned three sufficient conditions should prevail, not the conflicting "examples" cited by Goldman Sachs. Furthermore, conflict among the key provisions of the contract should be resolved in favor of Dalal and against the party that drafted that clause of the contract, which too is the law.

31. Mr. Dalal's sixth argument was that the termination of IPO Award violated New York Law, as applicable to forfeiture-for-competition agreements. Goldman Sachs' broad and audacious interpretation of the concept of Competitive Enterprise can only be understood as an attempt to prevent Dalal from working in any line of business in which he is likely to find employment. Thus the termination transformed the IPO Award into a non-compete agreement, one that was unrestricted in its scope, and hence illegal, for it violated the 'reasonableness doctrine' applicable under New York law.

32. Notwithstanding the strength of these arguments, Goldman Sachs focused its response on harassing Mr. Dalal, sullying his reputation and breaching the confidentiality of the arbitration process, which in any event was mandated by the contract. Goldman Sachs sought sensitive immigration and tax documents from unrelated third parties, including employers, headhunters and employees

10

younger than Mr. Dalal, with no knowledge about the matter. It introduced witnesses with no knowledge about the matter, and distributed multiple binders of information to such unrelated parties. Those binders contained information that was not needed for Goldman Sachs' defense and were distributed with no other purpose than to sully Mr. Dalal's reputation.

## CHOICE OF FORUM, LAW AND TIMELINESS

33. In terms of the choice of forum, the dispute involves an amount in excess of $75,000 and the parties are located in diverse jurisdictions. It is therefore proper to bring the matter to a Federal Court.

34. Also in terms of the choice of forum, it is notable that Mr. Dalal's filing with this Federal Court appeals an arbitration decision made by a panel seated in the District of Columbia, and which arbitration panel had conducted all proceedings within the District of Columbia. Although Goldman Sachs once opposed the appointment of the Arbitration Panel outside of New York, and cited several reasons why, both the NYSE Director of Arbitration and the Arbitrators had thoroughly rejected those claims. In any event, Goldman Sachs' motion had not been timely filed, and it had thus waived any opposition to proceedings in the District of Columbia. It is therefore proper to bring the matter to a court in the District of Columbia.

35. In terms of the choice of law, the contract sets forth New York law. While the substantive law is contractually set forth as New York's, Mr. Dalal notes that courts in the District of Columbia typically apply DC Law as the procedural law.

11

36. In terms of timeliness, courts in the District of Columbia have routinely considered statute of limitations issues as procedural matters, irrespective of substantive law.[1] Because the forum is properly the District of Columbia, DC procedural law, providing for 90 days from a final arbitration award for any appeal, properly applies. In any event, that is New York law as well. Here it is necessary to note that although the third notification of the award was postmarked March 10, 2006, it remains unsigned by the Arbitration Panel. As such the final order has not yet been issued. Out of abundant caution however, Mr. Dalal brings suit within 90 days, or thereabouts.[2]

### COUNT ONE: BREACH OF CONTRACT
### EVIDENT MISCALCULATION OF FIGURES
### UNDER THE UNIFORM ARBITRATION ACT

37. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 -36, as if fully set forth herein.

38. The Agreement constituted the only binding agreement between the parties. The Agreement clearly sets forth the number of shares of stock of Goldman Sachs awarded to Mr. Dalal. Therefore, once the Arbitrators determined that money was owed by Goldman Sachs to Mr. Dalal, the

---

[1] "Under customary choice of law principles, the laws of the forum…apply to matters of procedure…and, save where limitations is part of the cause of action itself, [a] limitation on the time of suit is procedural and is governed by the law of the forum." *Huang v. D'Albora*, 644 A.2d 1, 4 (D.C. 1994) (internal quotation marks and citations omitted).

[2] Mr. Dalal has been required to attend to an out-of-town medical emergency June 2-9, 2006, and therefore pleads with this Court to excuse any inadvertent delay in the mail. Previously, he hoped to making the filing locally.

calculation of the amount owed was simple. (1) An award in stock, equal to the number of shares written in the Agreement, or (2) the number of shares multiplied by the current stock price, which amounts to over $318,000.

39. The award of $25,000 therefore constitutes "an evident miscalculation of figures" under the Uniform Arbitration Act.[3]

40. As a result of the Arbitration Award, Mr. Dalal continues to be owed cash in an amount to be determined at trial, but no less than 2,123 shares of stock of Goldman Sachs (less the $25,000 awarded to date).

### COUNT TWO: BREACH OF CONTRACT
### MANIFEST DISREGARD OF THE LAW; AWARD FAILS
### TO DRAW ITS ESSENCE FROM THE UNDERLYING CONTRACT

41. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-40, as if fully set forth herein.

42. The Agreement constituted the only binding agreement between the parties. New York Law is the substantive law that applies. As such, the failure to award the full amount the contractual amount due Mr. Dalal represented a violation of key doctrines of New York law as applied to matters of employment,

---

[3] The citation is based on Section 13 of the Uniform Arbitration Act, as cited in §16-4312 of DC Law. See also Section 11 of the Federal Arbitration Act: "Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award."

13

including the reasonableness doctrine.[4] The law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case.

43. The award of $25,000 therefore constitutes a manifest disregard of the law under precedents set forth by the Second Circuit Court of Appeals, the Court of Appeals for the DC Circuit, as well as the several other circuits.[5] Under the standard developed by Federal Courts, the Arbitration Award fails to draw from the essence of the contract, for it clearly violates it, and Mr. Dalal continues to be owed cash in an amount to be determined at trial, but no less than the IPO Award (less the $25,000 awarded to date).

### COUNT THREE: BREACH OF CONTRACT AWARD IS IMPERFECT IN MATTER OR FORM, CORRECTING WHICH WOULD NOT AFFECT THE MERITS OF THE CONTROVERSY

44. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-43, as if fully set forth herein.

---

[4] See Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 202 (2d Cir. 1998). See also THERESA BRADLEY v. NASD Dispute Resolution Inc., CA No. 01-2047 (RBW), which was a case decided by the USD Court for DC.

[5] The permissible common law grounds for vacating such an award, which constitute the essential premises of this appeal, include those circumstances where an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law. See *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 & n.5 (4th Cir. 1998). Put simply, an arbitrator's legal determination "may only be overturned where it is in manifest disregard of the law," and an arbitrator's interpretation of a contract must be upheld so long as it "draws its essence from the agreement." *Upshur Coals Corp. v. United Mine Workers, Dist. 31*, 933 F.2d 225, 229 (4th Cir. 1991) (internal quotation marks omitted). An arbitration award fails to draw its essence from the agreement only when the result is not "rationally inferable from the contract." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 n.5 (4th Cir. 1998). See also U.S. Postal Serv., 204 F.3d at 527 ("When the arbitrator ignores the unambiguous language chosen by the parties, the arbitrator simply fails to do his job.")

45. The Agreement constituted the only binding agreement between the parties. Federal Arbitration Law and New York Law apply. As such, the failure to award the full and undisputable amount the contractual amount due Mr. Dalal confirms that the "award is imperfect in matter or form" but "not affecting the merits of the controversy." Section 11 of the Federal Arbitration Act clearly provides this as a ground for modification or reversal.[6] Under such law therefore, Mr. Dalal continues to be owed cash in an amount to be determined at trial, but no less than the IPO Award (less the $25,000 awarded to date).

### COUNT FOUR: BREACH OF CONTRACT
### UPON REQUEST, ARBITRATORS ARE BOUND BY NYSE RULES TO PROVIDE A REASONED OPINION; FAILING TO DO SO TOO IS A MANIFEST DISREGARD OF LAW

46. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-45, as if fully set forth herein.

47. The Agreement constituted the only binding agreement between the parties. Federal Arbitration Law and New York Law apply. NYSE Rules clearly give Mr. Dalal the right to receive a reasoned opinion. Failure to do so has been found by courts to bolster a finding of manifest disregard of the law. As such, the failure to provide a reasoned opinion too supports Mr. Dalal's claims.[7] Under

---

[6] FAA Section 11 provides that an award may be modified if it "is imperfect in matter or form not affecting the merits of the controversy."

[7] The Court reasoned that "where a reviewing court is inclined to find that arbitrators manifestly disregarded the law or the evidence and that an explanation, if given, would have strained credulity, the absence of explanation may reinforce the reviewing court's confidence that the arbitrators engaged in manifest disregard." Absence of a written rationale buttresses their contention that the arbitrators manifestly disregarded the law or the evidence in rendering

such law therefore, Mr. Dalal continues to be owed cash in an amount to be determined at trial, but no less than the IPO Award (less the $25,000 awarded to date).

## COUNT FIVE:
## QUANTUM MERUIT CLAIM AGAINST GOLDMAN SACHS
### (Alternative theory of Recovery)

48. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-47 as if fully set forth herein.

49. Mr. Dalal expended significant time and resources to provide services to Goldman Sachs, including working full time for two years, doing substantially all the work among twenty five associates. Dalal provided the services requested with the reasonable expectation that he would be compensated for those services.

50. Goldman Sachs accepted the services Mr. Dalal provided and gained value from those services provided. Mr. Dalal is entitled to the fair and reasonable value of the services he provided. Failure of the arbitration panel to consider this well settled law too constitutes a manifest disregard of the law.

## COUNT SIX:
## UNJUST ENRICHMENT BY GOLDMAN SACHS
### (Alternative theory of Recovery)

51. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-50 as if fully set forth herein.

52. Mr. Dalal worked for the benefit of Goldman Sachs. Mr. Dalal gave up

---

their award. See *Neary v. Prudential Insurance Company of America*, No. 96 Civ. 1513, 1999 WL 692393 (D. Conn. Aug. 27, 1999) (failure of NASD arbitration panel to explain their award buttresses conclusion that panel manifestly disregarded the law or the evidence)

lucrative alternative employments for its benefit. Mr. Dalal's experience and expertise were used by Goldman Sachs in its marketing materials for the period from September 1996 to August 1999. Whether by chance, Mr. Dalal's mistake or misfortune, Goldman Sachs was enriched by actions it had not paid for or worked for, and should not be permitted to unjustly to enrich themselves at the expense of Mr. Dalal but should make restitution of or for the property received.

53. Consequently, Goldman Sachs is liable to Dalal for additional cash damages to be determined at trial, but no less than the value of stock that was promised through the IPO Award.

WHEREFORE, Plaintiff demands judgment as follows:

1. On all six causes of action, damages in cash amount to be determined at trial, but no less than the amount of stock awarded by the IPO Award;

2. Punitive Damages; Costs, fees and interest; and such other and further relief as the Court deems just and proper.

Dated: June 6, 2006

BY: SANDEEP DALAL
2111 Wisconsin Avenue, NW
Washington, DC 20007
(202) 342-1205
Filed Via Fedex:
(202) 329-7534 Mobile
Clerk's Office
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001