# Uniform Submission Agreement

**■ NYSE**

_(Name of Sponsoring Organization With Which Claim is to be Filed)_

**In the Matter of the Arbitration Between:**

| Name(s) of Claimant(s) (Please print or type) | | Name(s) of Respondent(s) |
|---|---|---|
| SANDEEP DALAL | | KEVIN WHITNEY |
| | and | ASSOCIATE GENERAL COUNSE |
| | | GOLDMAN SACHS & CO. |

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached Statement of Claim, Answers, and all related Counterclaims, and/or Third-Party Claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgement and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties here by voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgement.

5. IN WITNESS HEREOF, the parties hereto have signed and acknowledged the foregoing Submission Agreement.

Claimant(s) Signature(s)

_Sandeep Dalal_

Respondent(s) Signature (s)

**FOR CLAIMANTS WHO ARE INDIVIDUALS***

State of WASHINGTON, DC, County of WASHINGTON, DC, ss: 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

On the 27TH day, of OCTOBER, 2004, before me personally appeared

SANDEEP DALAL to me known and known to me to be the person(s)

who executed the foregoing instrument, and ( he ) acknowledge to me that ( he ) executed the same.

City/County of ARLINGTON
Commonwealth of Virginia
The foregoing instrument was acknowledged before
me this 27 day of October, 2004 by
SANDEEP DALAL
(Name of the person seeking acknowledgment)
Notary Public    MAY 31, 2008
My commission expires

Notary Public

* A corporate claimant is required to execute an acknowledgement in the form approved by the state in which it has its principal office. If assistance is required, please contact the Director of Arbitration.

av1666.5/25

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## INTRODUCTION

In April 1999, Goldman Sachs & Co. ("Goldman Sachs") awarded Mr. Sandeep Dalal ("Dalal") 2,123 Formula Restricted Stock Units, doing so in recognition of *past* services to all employees in anticipation of the initial public offering of the company's stock (the "IPO Award"). The company completed its initial public offering on the New York Stock Exchange on May 4, 1999. Dalal's employment with Goldman Sachs ended on August 27, 1999, at which time Dalal accepted employment as Vice President of Core Capital Partners, a Small Business Investment Company (SBIC) located in Washington, DC. In May 2000, Dalal accepted a new job, as President of India.com, an information technology and dotcom business based out of the United States and India.

Goldman Sachs preliminarily wrote to Dalal on June 5, 2000, informing him that the IPO Award had been terminated. After exchanges of letters, in accordance with the process required by the IPO Award, Goldman Sachs confirmed via a letter dated January 23, 2002 that the prior decision was to remain unchanged. The sole basis for termination of the IPO Award in Goldman Sachs' letters was the claim that Dalal had "engaged in competitive activity,"[1] applying specific provisions of Section 4(b)(ii) of the terms and conditions which govern the IPO Award.

Dalal disagrees, and respectfully submits this brief for arbitration in opposition to Goldman Sachs' erroneous conclusion. In support of his position, Dalal respectfully submits the following facts for arbitration and remedy. Per NYSE Arbitration Rules, he requests a reasoned, written decision from the honorable Arbitrators. Per the terms and conditions of the contract, Dalal requests confidentiality. Confidentiality must cover materials related to the arbitration, including but not limited to documents submitted by him and Goldman Sachs, arguments made by both sides and names and addresses of parties.

## SUMMARY OF DALAL'S ARGUMENTS

**Goldman Sachs granted Dalal the IPO Award in recognition for services performed by him in the *past*. Top management additionally assured Dalal that he would be able to retain his IPO Award. Dalal was an employee of the company at the time of the IPO Award, remaining so well past the date of the initial public offering. With the passage of time, as the company's high profile IPO was in the past, as political strife within the organization subsided, as the public relations risk of employee disputes receded and as the value of Dalal's goodwill declined, Goldman Sachs reneged on its commitment. It then**

---

[1] Goldman Sachs letter to Dalal dated June 5, 2000 referenced "Termination of IPO Award," included as Exhibit E.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

terminated the IPO Award, doing so without regard to specific facts (which evidence that Dalal's subsequent employers were not a "Competitive Enterprise"[9]); without basis in written terms and conditions (which place three incremental hurdles that were unmet); without regard to oral contracts (which promised Dalal that he would be permitted to retain the IPO Award even if he were to join a competitor); without regard to written assurances (which preamble the IPO Award as vested stock for *past* services, not future commitments); without regard to conflicts among contradictory provisions of the contract (which further belie Goldman Sachs' conclusion); without regard to the fact that the *de facto* non-compete agreement violates New York law; without commitment to the covenant of good faith and fair dealing implicit in all contracting; and without regard to a quantum meruit claim for work performed in fiscal year 1999 (which arises upon termination of the IPO Award).

*Argument I:*

Goldman Sachs Erroneously Applied Definition of "Competitive Enterprise."[9]

*Argument II:*

Goldman Sachs Erroneously Applied Cited Provision Section 4(b)(ii).

*Argument III:*

Goldman Sachs Breached Oral Contracts.

*Argument IV:*

Goldman Sachs Breached Written Assurances.

*Argument V:*

Goldman Sachs' Contractual Provisions Are Contradictory.

*Argument VI:*

Goldman Sachs' Termination Of IPO Award Violates New York Law As Applicable To Forfeiture-For-Competition Agreements.

*Argument VII:*

Goldman Sachs Breached Covenant Of Good Faith And Fair Dealing.

*Argument VIII:*

Goldman Sachs' Actions Created A Quantum Meruit Claim.

The above arguments are not set forth as legal theories. Nevertheless they rely on legal theories of breach of written and oral contracts, contracts upon which Dalal relied when giving up compensation due and earned in 1999, and of promissory estoppel, assurances and promises by Goldman Sachs upon which Dalal relied. As a result of Goldman Sachs' failure to abide by its contracts, its false promises and its false representations, and Dalal's reasonable reliance upon them, Dalal stands damaged. Additional legal theories cover a claim brought forth under covenant of good faith and fair dealing and a claim brought forth as a quantum meruit claim.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## GOVERNING DOCUMENTS

Dalal's IPO Award was made pursuant to a booklet titled the *IPO Award Summary*, included here as Exhibit A. The IPO Award included an *IPO Award Statement For: Sandeep Dalal*, included here as Exhibit B. Further, the IPO Award is governed by terms and conditions set forth in writing in a booklet titled the *1999 Formula RSU Award Agreement* (the "Agreement"), included here as Exhibit C.

In addition to the aforementioned documents, relevant materials also include (1) a Goldman Sachs letter dated April 1999 (no day provided) to all employees from the top management of Goldman Sachs, included here as Exhibit D, (2) a Goldman Sachs letter to Dalal dated June 5, 2000 referenced "Termination of IPO Award," included here as Exhibit E, (3) Dalal's letter to Goldman Sachs dated October 16, 2000, included here as Exhibit F, (4) a Goldman Sachs letter to Dalal dated December 15, 2000, included here as Exhibit G, (5) a Goldman Sachs letter to Dalal dated April 26, 2001, included here as Exhibit H, (6) Dalal's letter to Goldman Sachs dated October 28, 2001, included here as Exhibit I, (7) Dalal's letter to two Partners of Goldman Sachs dated October 28, 2001, included here as Exhibit J, and (8) a Goldman Sachs letter to Dalal dated January 23, 2002, included here as Exhibit K.

Other documents governing the IPO Award are (1) The Goldman Sachs 1999 Stock Incentive Plan, (2) part of a prospectus of The Goldman Sachs Group, Inc. titled The Goldman Sachs 1999 Stock Incentive Program, (3) the booklet titled *Formula Restricted Stock Units: June 2000 Delivery*, (4) the Custody Agreement between Goldman Sachs and Chase Manhattan, (5) Goldman Sachs IPO Award—Instruction Guide, (5) a November 1999 letter containing procedures for former employees and (6) the Former Employee Information Form. These six documents are not included here since each is silent on the terms and conditions governing the IPO Award and lack pertinence to the issues at hand.

## CHOICE OF FORUM AND LAW

The IPO Award is governed by written contract among the parties. Section 15 of that Agreement calls for any dispute, controversy or claim to be settled by arbitration in New York City by the New York Stock Exchange, and if the matter is declined by the New York Stock Exchange, by the American Arbitration Association in accordance with its commercial arbitration rules. Section 16 of the Agreement subjects the IPO Award to laws of the state of New York. Dalal respectfully submits the matter to the New York Stock Exchange for arbitration.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

### TIMELINESS.

The IPO Award is governed by written contract among the parties and governed by New York's statute of limitations. Pursuant to contractual requirements, reconsideration of Goldman Sachs' termination was required to first be sought with Goldman Sachs prior to the initiation of any arbitration proceeding. Goldman Sachs declined to reconsider its decision, complemented Dalal for compliance with "requirement set forth in Paragraph 15(a)" and green lighted an arbitration filing via a letter dated January 23, 2002.[2] The statute of limitations on the contract runs from the date of that letter. Dalal respectfully submits that his request for arbitration is timely and in accordance with provisions of New York law, as well as Rule 603 of the NYSE Arbitration Rules.

### RELEVANT FACTS

#### *Summary Of Dalal's Background*

Dalal is a permanent resident of the United States Of America and a citizen of the Republic Of India.

Dalal joined Goldman Sachs in August 1996 as an Associate in the Leveraged Finance Group, pursuant to a written offer letter. At the time, Dalal had already completed an master's degree in business administration from Harvard Business School in 1996 and a master's degree (specializing in international banking and finance) from Columbia University's School Of International & Public Affairs in 1991. Dalal had also completed a bachelor's degree in economics (honors) from St. Stephen's College at the University of Delhi in India. He had also worked for three years as an Investment Banking Analyst at Lehman Brothers, where he was ranked at the top of his class and given an offer to stay on as an Associate. At the time of his joining Goldman Sachs, Dalal had also worked summer jobs with Bain & Company in London in 1995, which gave him an offer to become an associate, and with Credit Suisse's Treasury Group in 1991.

#### *Review Of IPO Award And Termination*

Consistent with NYSE Rule 612(a), Dalal wishes to present the following relevant facts in support of his case.

On April 8, 1999, as part of a company-wide award of stock ownership to all employees at the time of the company's initial public offering of stock, Dalal's

---

[2] Goldman Sachs letter to Dalal dated January 23, 2002, included here as Exhibit K.

CONFIDENTIAL PAGE 5

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

supervisors John Townsend (Partner & Managing Director) ("Townsend") and Adrian Kingshott (Managing Director) ("Kingshott") informed him generically of an award, in anticipation of an oncoming initial public offering. As explained to Dalal, the equity awards were of two kinds, one for prior service (constituting 100% of Dalal's IPO Award) and the other an incentive for future employment. Among other details, Dalal was informed that his IPO Award was not contingent on future service. He was also told that he would receive no incentive stock option for future service at the firm.[3]

Weeks later, Goldman Sachs executed an initial public offering of its shares on the New York Stock Exchange. Townsend and Kingshott specified the details of the IPO Award to Dalal, informing him in person of the numerical amount of the IPO Award, included here as Exhibit B. At the time, they summarized the key terms and conditions of the IPO Award, including reiterating, among other things, that Dalal's IPO Award was not contingent on future service.

At the time of those conversations, Dalal's work was distinguished by its quality. He had been assigned to virtually all the revenue generating transactions executed by the leveraged finance group in which he was an associate. Although there were approximately seventy professionals within the group, twenty-five to thirty of whom were associates like Dalal, he was chosen to be the associate on seven out of nine revenue generating transactions in the months up to the IPO Award. Dalal did the bulk of the execution work on millions of dollars worth of fees in the last twelve months of his tenure at Goldman Sachs, more than all the other associates in his group combined. Not only was he bearing the disproportionate burden of executing revenue-generating projects in the group but he was also preferred by clients to be the point person in their conversations with Goldman Sachs.

Also indicative of Dalal's reputation at the time of the IPO Award was the remarkable statistic in his last annual review in November 1998, which indicated that approximately fourteen bankers at Goldman Sachs considered his work 'exceeded' the standards of a banker. Interestingly, that number was higher than the total number of reviewers submitted by his peers (who asked for an average of twelve reviews, ranging from six to fourteen reviews). Clearly then, any honest reading of those reviews suggested that he was among the top ranked associates in his class. This context of honest hard work is central to the fairness of Dalal's arguments. It not only evidences that equities are in favor of Dalal but buttresses contractual arguments, the quantum meruit claim and punitive damage claim set forth later.

---

[3] Dalal was also told that he would be permitted to keep his IPO Award when he left Goldman Sachs, an arrangement he believed was entered into with everyone who was not given a retention award.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Goldman Sachs completed its initial public offering on May 4, 1999, doing so at a price of $75 per share. The underlying value of Dalal's IPO Award is set forth later in this brief. The detailed terms and conditions were later provided to Dalal in writing in two booklets, the IPO Award Summary (included here as Exhibit A) and the Agreement (included here as Exhibit C). The IPO Award was deliverable in three equal installments, on each of the first, second and third anniversary of the initial public offering. Specifically, 707 shares were deliverable on the first anniversary of the IPO, 708 shares were deliverable on the second anniversary of the IPO and 708 shares were deliverable on the third anniversary of the IPO. Dalal remained an employee of Goldman Sachs through August 27, 1999, well past the IPO date.

Dalal's choice of subsequent employment included both investment banks and a Small Business Investment Corporation named Core Capital Partners. Prior to finalizing Dalal's employment choices, he met with Townsend and Kingshott on occasion, partly out a desire to confirm the retention of his IPO Award. He also met frequently with Linda Fox and Andrew Walker, vice presidents in the human resources department of Goldman Sachs. Townsend and Kingshott told Dalal that retention of his kind of award was not an issue. They committed to permitting Dalal to retain his IPO Award when he left Goldman Sachs, even if he accepted employment with an investment bank, *even if* that investment bank was a clear competitor in the area in which he had worked at Goldman Sachs.[4] By inference, Dalal's employment with Core Capital Partners must be understood to even more clearly conform to Goldman Sachs' preferences and desires, since a Small Business Investment Company is in a different line of business than the one he (or anyone) was engaged in at Goldman Sachs, and less a competitor than banks with which Townsend was comfortable.

Given that the assurance had first been made in April 1999, when Townsend had acted as a partner of Goldman Sachs, then still a private partnership, and confirmed later when Townsend had acted as Managing Director and Member of Commitments Committee, pursuant to firm wide responsibilities of Goldman Sachs (now a public corporation), Dalal was rest assured. Based on those assurances, Dalal sought no compensation from Core Capital Partners for the contingent loss of the IPO Award. Goldman Sachs unreasonable change of heart thus denied Dalal an opportunity to obtain make-whole compensation from Core Capital Partners, or from another employer, or alternatively join an employer that would not have triggered a termination of the IPO Award.

---

[4] Dalal will seek to confirm those conversations through deposition of several current and past employees of Goldman Sachs.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

*Rationale For IPO Award*

The IPO Award was made for *past services* performed as an employee of Goldman Sachs, not for future services or for continued employment after the IPO date. That was clearly established on page three of the IPO Award Summary (included as Exhibit A).

> In general, your Formula RSU Award was determined based on your compensation and years of service with the firm.[5]

The above language is clear. This point is relevant both in the context of the argument that segments of the IPO Award contradict each other as well as the covenant of good faith and fair dealing, which suggests that the IPO Award should be construed to be exactly what it is labeled.

Further, page three of the IPO Award Summary goes onto to clarify that the 2,123 shares were fully vested on the IPO date.

> The Formula RSUs are "vested" in the sense that you do not need to remain employed by the Firm in order to receive the underlying Common Stock...[6]

Section 11 of the Agreement further clarifies the past due nature of the IPO Award, where it specifically states that the IPO Award cannot be construed as giving Dalal:

> ...any right to continued Employment by the Firm or affect any right which the Firm may have to terminate or alter the terms and conditions of your Employment.[7]

Neither the staggered delivery schedule of the IPO Award nor Goldman Sachs' subsequent desire to deny Dalal his stock can detract from the indisputable fact that the economic value being arbitrated constituted a right already duly *earned* and a compensation *past due*. The point becomes important to a later argument, where Dalal argues that the termination of the IPO Award turns it into a non-compete agreement. If Goldman Sachs believes that the terms of the IPO Award permit it to seek 'forfeiture-for-competition,' it must then adhere to both the 'reasonableness doctrine' and the 'employee choice doctrine' under New York law, which then become applicable, and which then preclude Goldman Sachs' decision.

---

[5] The IPO Award Summary, included here as Exhibit A.
[6] The IPO Award Summary, included here as Exhibit A.
[7] The IPO Award Summary, included here as Exhibit A.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

### *Termination Of IPO Award*

On June 5, 2000, Goldman Sachs informed Dalal via letter titled "Termination of IPO Award" (included here as Exhibit E) that Dalal's IPO Award had been terminated and no shares or cash were deliverable with respect to Dalal's IPO Award. Goldman Sachs provided only one reason for the termination of the IPO Award, stating:

> ...you have engaged in the competitive activity described in Paragraph 4(b)(ii) of your RSU Agreement. Accordingly, all of your rights in respect of your 2,123 Formula RSUs terminated as of June 2, 2000, and no shares will be delivered in respect of those RSUs.[8]

### *Subsequent Communication Among The Parties*

In accordance with the process outlined in the termination letter, Dalal submitted to Goldman Sachs, via a letter dated October 16, 2000, details of his disagreement with the termination of the IPO Award (included here as Exhibit F). Dalal was required to do so per Section 15(a) of the agreement, which mandated Dalal to apply to Goldman Sachs for reconsideration prior to any arbitration. Goldman Sachs acknowledged receipt of Dalal's response via a letter dated December 15, 2000, informing Dalal of a final decision by April 2001 (included here as Exhibit G). On April 26, 2001, Goldman Sachs affirmed termination of Dalal's IPO Award (included here as Exhibit H), which letter cited the same, sole reason for termination.

> ...we have determined that you did not meet the condition for delivery contained in Paragraph 4(b)(ii) of your RSU Agreement.[9]

Dalal responded once again via a letter dated October 28, 2001 (included here as Exhibit I) but which elicited no change of position by Goldman Sachs. Dalal also wrote to Townsend and Robert Kaplan, the former being the officer who made the verbal assurances on behalf of Goldman Sachs (included here as Exhibit J). Yet Goldman Sachs informed Dalal via a letter dated January 23, 2002 (included here as Exhibit K) that its decision was unchanged, that Dalal had met the requirement of Section 15(a) of the Agreement, which required that Dalal's claims first be submitted to Goldman Sachs for consideration, prior to initiation of arbitration. Thus the stage was set for the current arbitration.

---

[8] Goldman Sachs letter to Dalal dated June 5, 2000 referenced "Termination of IPO Award," included here as Exhibit E.

[9] Goldman Sachs letter to Dalal dated April 26, 2001, included here as Exhibit H.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

*Necessary And Sufficient Conditions Under Section 4(b)(ii)*

Since part of the disagreement among the parties may be distilled into the parties' differing understandings of Section 4(b)(ii) of the agreement, it is pertinent to discuss it in detail. Only the full section is extracted as a footnote here, with the full agreement available as Exhibit A.[10]

The contractual language makes clear that Goldman Sachs must conclude that Dalal worked for a "Competitive Enterprise" (please turn to footnote). But proving that Dalal was employed by a Competitive Enterprise is merely the first step, a necessary condition, so to speak, for establishing Goldman Sachs' right to termination.

The second step requires Dalal's employment with a presumed Competitive Enterprise to incrementally have at least one of three characteristics. First, the work must be "similar or substantially related" to the work performed by Dalal in the last twelve months of his tenure at Goldman Sachs. Second, the work must be one for which Dalal had "supervisory responsibility" in the last twelve months of his tenure at Goldman Sachs. Third, the work must require the "same or specialized skills" as those used by Dalal in the last twelve months of his tenure at Goldman Sachs.

---

[10] Per the Glossary of Terms included at the end of the Agreement, a "Competitive Enterprise" as referred to in Section 4(b)(ii) of the Agreement:

> means a business enterprise that (i) engages in any activity, or (ii) owns or controls a significant interest in any entity that engages in any activity, that, in either case, competes anywhere with any activity in which the Firm is engaged. The activities covered by the previous sentence include, without limitation, financial services such as investment banking, public or private finance, lending, financial advisory services, private investing (for anyone other than you and members of your family), merchant banking, asset or hedge fund management, insurance or reinsurance underwriting or brokerage, property management, or securities, futures, commodities, energy, derivatives or currency brokerage, sales, lending, custody, clearance, settlement or trading.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

**To summarize the section cited by Goldman Sachs, the concept of Competitive Enterprise is clearly limited by contextual and time constraints and cannot be read piecemeal or read selectively (please turn to footnote).[11] Proving that Dalal's employers were a Competitive Enterprise is a necessary condition for establishing termination but not a sufficient condition, for which Goldman Sachs must fulfill three additional contractual hurdles set within the same section, all of which remain beyond its grasp in the current context.**

*Note On Rest Of Section 4(b)(ii)*

Goldman Sachs' contention clearly ignores both the necessary and sufficient conditions just cited. Presumably, for the sake of argument only, Goldman Sachs is relying on the language at the end of Section 4(b)(ii), which lists examples of prohibited activity, listed as "[b]y way of example only" (please turn to footnote). First and foremost, none of the examples apply to Dalal, who was not an advisory banker, and certainly did not join a leveraged buyout fund. Second, even if Goldman Sachs believes that it is permitted to terminate the IPO Award

---

[11] Section 4(b) of the agreement states that Dalal's IPO Award would terminate if:

> You will have engaged in conduct specified in this Paragraph 4(b) if, as determined by the Committee, at any time prior to the relevant Delivery Date:
>
> ...
>
> (ii)    in the event you are categorized by the Firm as an exempt employee (or the equivalent outside the United States) on the relevant Delivery Date or were so characterized on the date of termination of your Employment, you (A) form, or acquire a 5% or greater equity ownership, voting or profit participation interest in, any Competitive Enterprise, or (B) associate (including, but not limited to, association as an officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise and in connection with such association engage in, or directly or indirectly manage or supervise personnel engaged in, any activity (1) which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Firm, (2) for which you had direct or indirect managerial or supervisory responsibility at the Firm or (3) which calls for the application of the same or similar specialized knowledge or skills as those utilized by you in your activities with the Firm, at any time during the one-year period immediately prior to termination of your Employment (or, in the case of an action taken prior to termination of your Employment, during the one-year period immediately prior to such action), and in any such case, irrespective of the purpose of the activity or whether the activity is or was in furtherance of advisory, agency, proprietary or fiduciary business of either the Firm or the Competitive Enterprise. (By way of example only, this provision would preclude an "advisory" investment banker from joining a leveraged-buyout firm, a research analyst from becoming a proprietary trader or joining a hedge fund, or an information systems professional from joining a management or other consulting firm and providing information technology consulting services or advice to any Competitive Enterprise.); or

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

on the basis of the examples cited, it cannot contend that the throwaway language at the end of the section can be allowed to contradict the contractual language of Section 4(b)(ii). Any information cited "[b]y way of example only" is exactly that, no more, examples that merely illuminate Goldman Sachs' intent as drafter of the terms and conditions. But even that intent is interesting if and only if the examples do not overwhelm the contractual language. But they do overwhelm the contractual language, so Dalal respectfully submits that Goldman Sachs cannot rely on those "examples only" for they so clearly contravene clear contractual language.

Presumably, once again for the sake of argument only, Dalal believes that Goldman Sachs included the throwaway language so that it superficially fulfills the 'reasonableness doctrine' of non-compete clauses under New York law without actually doing so in fact, thus enabling the company to have its cake and eat it too. Instead, Dalal contends that both the plain-English meaning and well-established principles of contract construction suggest that the "examples only" must fade away in favor of the necessary and sufficient conditions just summarized.

DETAIL OF ARGUMENTS

*Argument I:*
*Goldman Sachs Erroneously Applied Definition Of "Competitive Enterprise"*

**Summary Of Argument I**

Firstly, neither Core Capital Partners nor India.com, Dalal's subsequent employers, constitute a "Competitive Enterprise," as defined in the IPO Award documents.[12] As detailed in this brief, Dalal's work at a Small Business Investment Company such as Core Capital Partners was completely unrelated to work performed by him in the last twelve months of his tenure at Goldman Sachs, as an underwriter of high yield bonds and leveraged loans. As also detailed here, Dalal's subsequent appointment as President of India.com was even more unrelated to his work at Goldman Sachs, being a management position in the Internet services industry, with no business in *any* aspect of finance. Indeed, neither India.com nor Core Capital Partners

> (i) engages in any activity, or (ii) owns or controls a significant interest in any entity that engages in any activity, that, in either case, competes anywhere with any activity in which the Firm is engaged[13]

---

[12] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.
[13] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

In other words, *Dalal's IPO Award was terminated pursuant to a definition of Competitive Enterprise that is clearly unavailing.*

Type Of Work Done At Goldman Sachs

Dalal's work at Goldman Sachs between August 1998 and August 1999 (the last twelve months of his tenure) was specific and focused to the area of high yield debt issuances and leveraged lending, for large companies, with significant amounts of debt, and hence ones with stable revenues and significant free cash flows. Goldman Sachs is among the biggest of the big investment banks and, in Dalal's field of leveraged finance, acted as an *agent* in its transactions, raising capital for others in amounts no less than $100 million at a time, and preferably in greater amounts. While Dalal's work at Goldman Sachs related to the arcane world of large debt financings in its role as an *agent* and *underwriter*, Dalal's subsequent work was in venture capital as a *principal* and *investor*, even interacting with companies so small as to be unqualified and unsuitable for debt, the business he was engaged in at Goldman Sachs.

Further, Goldman Sachs is neither a Small Business Investment Company, subject to investment criteria statutorily set by the US Small Business Administration (as is Core Capital) nor a dotcom (as is India.com). In the first context, Goldman Sachs cannot engage in the business of a Small Business Investment Company, without registering with the Small Business Administration, which it has not done. Even if it were to do so, those requirements are onerous, requiring Goldman Sachs' $5 billion+ fund to invest in "small companies" only, with less than $18 million in net worth and $6 million in net income, thus precluding a private equity player of its size from being a competitor to small business investment companies. With regard to the second context, Goldman Sachs cannot be considered a provider of free email, news, chat and other dotcom services, without violating common sense.

Core Capital Partners Was Not A Competitive Enterprise

Core Capital is not a multi-billion "venture capital" fund that competes with the likes of Goldman Sachs. Core Capital Partners, which Dalal joined at inception as Vice President, was a $60 million fund with $100 million from the Small Business Administration. It had four professionals and two support staff in Washington, DC. The fund focuses on information technology, and technology-impacted companies, the communications industry and the business services sector.

Core Capital Partners was an investor in the smallest-of-small-capitalization companies in the early stages of growth, principally in technology and technology-impacted businesses. Core Capital Partners acted as *principal* in all its

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

transactions, investing capital for itself in amounts no more than $1-2 million at a time. Dalal's work at Core Capital Partners was specific and focused to the area of venture capital, for small companies rather than large companies, companies in technology and other high growth sectors versus non-technology and slow growth sectors, companies with no debt rather than significant amounts of debt, companies that were unprofitable and often without revenues rather than stable revenues and high free cash flows, companies focused in the mid-Atlantic states rather than globally, companies that could have one day become clients of Goldman Sachs were they to grow enormously.

Further, all investments made while Dalal was at Core Capital Partners were made under the regulations of the Small Business Administration, which Goldman Sachs is not qualified to make. So Core Capital Partners cannot be a Competitive Enterprise as defined in the Agreement. In fact the equity of Core Capital Partners fund is equal to many single investments by Goldman Sachs. Even worse, the total equity of $60 million of Core Capital is certainly less than the net worth of many a partner of Goldman Sachs, even those who are involved in this matter. Section 4(b)(ii) of the Agreement is thus unavailing.

India.com Was Not A Competitive Enterprise

In May 2000, Dalal joined India.com, Inc. as President, a startup information technology services and dotcom company with 200 employees in the United States and India. Dalal's work as President of India.com was specific and focused to dotcom and information technology services for individuals and businesses, a company that could have one day become a client of Goldman Sachs, were it to have grown enormously.

At the time Goldman Sachs terminated Dalal's IPO Award, Dalal was President of India.com, a New Jersey company that sought to become the leading supplier of dotcom services and information technology products and services in India. The Company's core business strategy was to leverage the power of the Internet to bring Indian businesses online. In addition, India.com launched a comprehensive portal in 2000, focused on compelling content and commerce functionalities for the Indian Diaspora.

Neither dotcom services for the Indian Diaspora nor information technology products for India are businesses in which Goldman Sachs has ever been engaged at any time. India.com too cannot be a Competitive Enterprise. The necessary condition for Section 4(b)(ii) of the Agreement is thus absent and makes the whole clause unavailing.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Cooperative, Not Competitive Relationship

Dalal's relationship with Goldman Sachs after August 1999 was cordial, interactive and non-competitive. Generally speaking, not only were Core Capital and India.com not competitive with any business of Goldman Sachs but both were organizations from which Dalal referred ideas and advice to Goldman Sachs. Within months of communicating with Goldman Sachs, however, Dalal realized that the threshold size of its prospective clients or portfolio investments was so big that any companies or ideas Dalal was dealing with were outside the interest and orbit of Goldman Sachs. Nevertheless Dalal's professional interactions continued and there was a general sense on both sides that both Core Capital Partners and India.com were ideal breeding ground for future business for a behemoth financial institution. Additionally, while at India.com, Dalal was introduced in 2000 to Goldman Sachs' investment banking research team in Asia to begin the process of introducing India.com to work together for an initial public offering of the company with that investment bank. Dalal was glad to pass along leads or references to Goldman Sachs' India Investment Banking team hired in 2000, which was personally known to Dalal.

It is worth summarizing a few of Dalal's interactions with Goldman Sachs. Although many communications do not survive in email form, the following did, and are clearly confirmatory of the fact that the relationship was cooperative, not competitive.

- First, whenever an investment was suitable for Goldman Sachs, Dalal approached them with that idea. One such email in 1999, to partners Joe Gleberman, Thomas Murphy and John Townsend, is included here as Exhibit L. Dalal also undertook phone and email conversations with Goldman Sachs employees in the United States, Europe and Asia with regard to investment opportunities too big for Core Capital, and which turned out to be too small for Goldman Sachs.

- Second, Dalal alerted Jan Ford, a Vice President in the Legal Department of Goldman Sachs with regard to someone falsely claiming to have worked at Goldman Sachs and in her group. Dalal would not have done so were he in a competitive context. A string of those emails in 2000 is included as Exhibit M.

- Third, Dalal routinely received investment banking research reports while at Core Capital (mainly on the technology sector) and at India.com (mainly on the Asia dotcom business). Those research reports may be provided upon request and remain retained by Dalal.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

- Fourth, Dalal approached Goldman Sachs in 2000 in connection with a prospective initial public offering of India.com. Those exchanges may be summarized upon request.

The aforementioned anecdotes should help inform any reasonable analysis that Dalal was not engaged in competitive activity; indeed, he was in a cooperative relationship.

*Argument II:*
*Goldman Sachs Erroneously Applied Cited Provision Section 4(b)(ii)[14]*

### Summary Of Argument II

Even if either Core Capital or India.com or both are hypothetically assumed to be a Competitive Enterprise (doing so here for the sake of argument only), at least one of three additional requirements had to be fulfilled as well, for the cited provision to become available to Goldman Sachs, yet not one of those hurdles was overcome:

- One, Core Capital Partners and/ or India.com must not only be a Competitive Enterprise but Dalal's work at those entities must be "similar or substantially related"[15] to the work performed in the last twelve months of his tenure at Goldman Sachs. As detailed later, this requirement was prima facie unfulfilled.

- Two, Core Capital Partners and/ or India.com must not only be a Competitive Enterprise but Dalal's work there must be of the kind for which Dalal had "supervisory responsibility"[16] in the last twelve months of Dalal's tenure at Goldman Sachs. At best (for Goldman Sachs), this requirement was unfulfilled because Dalal's subsequent work was starkly dissimilar to his prior work in the last twelve months at Goldman Sachs. At worst (for Goldman Sachs), Dalal had *no* supervisory responsibility at Goldman Sachs, suggesting that the clause was intended to target more senior employees, and inapplicable to his case.

- Third, Core Capital Partners and/ or India.com must not only be a Competitive Enterprise but Dalal's work there must call for the "same or specialized skills"[17] as those used in the last twelve months of Dalal's tenure

---

[14] The lack of employee choice makes Section 4(b)(ii) unavailable in any context, but the issue is developed later in context of de facto non-compete agreement.
[15] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.
[16] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.
[17] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

at Goldman Sachs. This third requirement was also unfulfilled, partly for reasons detailed later but mostly for the fact that it defies common sense.

### All Three Hurdles Unmet With Regard To Core Capital Partners

Lets consider the three additional factors that must be present in the context of Core Capital Partners for a termination of Dalal's IPO Award, but which were not.

At Core Capital Partners, Dalal did not engage in any activity related to the US high yield debt markets, and there was thus no overlap with Dalal's work in the last twelve months of Dalal's tenure in the high yield and leveraged finance group of Goldman Sachs. Subsection (B)(1) of Section 4(b)(ii) of the Agreement was thus unavailing.

Further, Dalal did not have "any direct or indirect managerial or supervisory responsibility at the Firm," making Subsection (B)(2) of Section 4(b)(ii) of the Agreement moot and inapplicable, and certainly unfulfilled. For clarity, while at Core Capital Partners, Dalal did not "manage or supervise personnel engaged in" activities he had previously participated in while at Goldman Sachs.

Finally, Dalal's role at Core Capital Partners generally encompassed venture capital investing, which required skills specific to private equity investments. Each of those processes is distinctly different from the US high yield and leveraged lending markets. So Subsection (B)(3) of Section 4(b)(ii) of the Agreement is unfulfilled. It is an incredulous suggestion that the same skills may be required for contexts as disparate as investment banking versus venture capital; or non-technology versus technology industries; or risk aversion versus risk taking; or fee-based underwriting as an agent versus profit-based investing as a principle; or work where $75-100 million is the minimum threshold versus work where $1-2 million is the norm.

To illustrate the point further, consider many differences in skill: (a) warrants are not deminimus in the venture capital business, while they are in the high yield market, (b) stock purchase agreements are totally different from bond indentures, (c) due diligence processes for venture capital focus on upside potential, while high yield markets focus on downside protection, and so on and so forth, (d) Goldman and other investment banks acknowledge the very specific specialization that characterizes the leveraged finance field in the pattern of hiring professionals as well, (e) the deals invested in during Dalal's employment at Core Capital Partners were too small to reasonably expect Dalal to utilize knowledge of the leveraged finance world and (f) while at Goldman, Dalal's

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

activities provided him no exposure to the Internet or information technology sectors, which were the bulk of Dalal's work at Core Capital Partners.

All Three Hurdles Unmet With Regard To India.com

Even if India.com were a Competitive Enterprise, additional factors must be present for a termination of Dalal's IPO Award. Yet none of the three conditions mentioned in Section 4(b)(ii) of the Agreement were evident. At India.com, Dalal did not engage in any activity related to the US high yield debt markets and thus did not engage in any activity "which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Firm." Subsection (B)(1) of Section 4(b)(ii) of the Agreement was thus unavailing.

Further, Dalal did not have "any direct or indirect managerial or supervisory responsibility at the Firm," making Subsection (B)(2) of Section 4(b)(ii) of the Agreement inapplicable.

Finally, and even more clearly, Dalal's work as President of India.com did not call for the "application of the same or similar specialized knowledge or skills as those utilized by" Dalal as a specialist in high yield and leveraged lending. So Subsection (B)(3) of Section 4(b)(ii) of the Agreement is unfulfilled.

All in all, *the terms and conditions cited by Goldman Sachs were unavailing on account of three incremental hurdles set therein.* Even if both Arguments I & II are assumed to fail (doing so here for the sake of argument only), Goldman Sachs is estopped from applying Section 4(b)(ii).[18]

*Argument III:*
*Goldman Sachs Breached Oral Contracts*

Dalal sought and received assurances on three separate occasions from a Partner as well as a Managing Director of Goldman Sachs, who both assured Dalal that the IPO Award would not be terminated, when Dalal left the company, or even if Dalal were to join a competing investment bank.[19] Although Dalal decided not to join a competing investment bank, those oral contracts clearly preclude Goldman Sachs from applying the termination provision. Without those three oral contracts, made in three separate meetings, entered into by aforementioned two officers of the company, Dalal would certainly have sought alternative compensation that was his due, either from Goldman Sachs or from Core Capital.

---

[18] Dalal was also told that he would be permitted to keep his IPO Award when he left Goldman Sachs, an arrangement he believed was entered into with everyone who was not given a retention award.

[19] Dalal was given no incentive stock options to continue to stay on at the company.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Goldmans Sachs' promises and assurances, upon which Dalal relied, additionally denied him an opportunity to seek compensation from Goldman Sachs for his extraordinarily productive contribution to the firm in 1999 (as already alluded to).

Even if the other arguments are individually or collectively assumed to fail (assuming so only for the sake of argument here), *Goldman Sachs' breach of oral contracts thus defrauded Dalal of an opportunity to make whole his loss and denied him the benefit of his bargain.*

*Argument IV:*
*Goldman Sachs Breached Written Assurances*

If one were to grant Goldman Sachs' overly narrow reliance on the definition of a Competitive Enterprise alone, or on the throwaway language of Section 4(b)(ii), or whatever other reasoning it may choose to use, doing so violates the preamble of the IPO Award Summary, which specifically clarifies that the IPO Award is vested "in the sense that you do not need to remain employed by the Firm in order to receive the underlying Common Stock" (as quoted before).

The termination of the IPO Award thus removes the only real difference between awards given for *past* service (which constitute 100% of Dalal's award) versus awards given for *future* service (which were issued to many senior employees contingent on their continued employment but not to Dalal). It thus contradicts a common sense understanding that the IPO Award was not awarded for future service. Termination thus violated the preamble to the *IPO Award Summary* document.

More important to the argument at hand, Goldman Sachs clearly advertised and labeled Dalal's IPO Award as one for past services (an apple so to speak), not for future services (an orange so to speak). By the time the terms of the IPO Award were printed and distributed, Goldman Sachs had changed the orange, asking for the promise to not compete with it, not merely congratulating employees for past service. Even worse, by the time Goldman Sachs got around to the termination of the IPO Award, it had changed the orange further, suggesting not only no competition but no employment in any line of business in which Dalal can find employment. The termination of the IPO Award violates written assurances by top management about the IPO Award not being contingent on continued employment. Applying the analogy of apples and oranges, Goldmans Sachs violates the simple logic that if Dalal was promised an apple (an award for past services) and denied an orange (the chance to not compete with it or provide future services to it), he should receive an apple that is not an orange.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

In other words, Goldman Sachs now belatedly seeks to turn the IPO Award from being vested stock into unvested stock (which violates written assurances), or to turn it into a non-compete agreement (which violates New York law, which has twin doctrines of reasonableness and employee choice), or leave the preamble of the Agreement in contradiction with the terms of that same Agreement (which is picked up in the next argument). Above all else, it fails to distinguish between its two distinct types of awards. Instead, the contract should be constructed in a manner that gives meaning to the preamble and aforementioned provisions both, written contracts both, *to restore the only real difference between awards given for past service versus awards given for future service.*

*Argument V:*
*Goldman Sachs' Contractual Provisions Are Contradictory*

To reach Goldman Sachs' incorrect interpretation of the terms and conditions, one may presume it reads some language that is favorable to its point of view. Whether that language is throwaway language at the end of Section 4(b)(ii) or some other language in that section, Dalal respectfully submits that it contradicts the very provision it seeks to explain by example. Indeed, any reading of the whole section confirms that any concurrence with Goldman Sachs' perspective stands in contradiction to every point made under that provision.

Dalal respectfully submits that the throwaway language cannot be considered as part of the binding, contractual terms among the parties, but merely what it says it is: examples only, which seek to illuminate Goldman Sachs's own understanding of the aforementioned three incremental conditions, no more. It is merely throwaway language, specifically cited "by way of example only," and hence not binding on the honorable Arbitrators' plain-English or legal reading of the terms and conditions. To the extent that they are contradictory, the three conditions must stand on their own, but stand they must.

The above point is especially true if the honorable Arbitrators conclude (as Dalal does) that Goldman Sachs' "examples only" are surreptitious attempts to thwart the plain English and contractual reading of those three conditions. Indeed, it is Dalal's belief that Goldman Sachs inserted those three conditions to become compliant with the reasonableness doctrine of New York employment law, and hence to make the terms and conditions of the IPO Award robust and legal. Yet Goldman Sachs then inserted the throwaway language to surreptitiously do away with those same three conditions. While the strategy may superficially convey legal advantage, it renders a contract that the honorable Arbitrators should declare to be too clever by half.

Alternatively, if the contractual terms are construed to give primacy to the "examples only," assuming so for the sake of argument only, they would render

the three incremental conditions of Section 4(b)(ii) moot, for the contractual terms would then be no more than what is already covered by the definition of Competitive Enterprise alone. Perhaps Goldman Sachs seeks termination of the IPO Award on a *standalone reading* of the Glossary Of Terms in the Agreement, in which a Competitive Enterprise is defined. Yet no matter Goldman Sachs' perspective, it cannot be the intent of the contract to render Section 4(b)(ii) (or its three incremental conditions) moot.

In summary, to the extent that the throwaway language conflicts with the contractual language, and especially if it is pertinent to the arbitration at hand, it must be forced to recede. Applying well-established principles of contract construction, *the aforementioned three requirements should prevail, not the conflicting "examples" cited by Goldman Sachs (none of which apply to Dalal in any event).* Furthermore, conflict among the key provisions of the contract should be resolved in favor of Dalal and against the party that drafted that clause of the contract, per New York law.[20] In other words, *since Goldman Sachs was the sole drafter of the Agreement, any ambiguity should be resolved against it and in favor of Dalal.*

*Argument VI:*
*Goldman Sachs' Termination Of IPO Award Violates New York Law*
*As Applicable To Forfeiture-For-Competition Agreements*

**Summary Of Argument VI**

Even if one were to hypothetically assume that the aforementioned arguments all fail (doing so here for the sake of argument only), termination of the IPO Award cannot stand for three interrelated reasons, relating to its non-compete feature.

- First, the *termination constituted a backdoor and backdated non-compete agreement,* contradicting the IPO Award's own description of itself. Based on written terms and conditions provided to Dalal at the time of the IPO Award, there was *no* requirement for him to remain employed at Goldman Sachs or to perform services for the company in the future to enjoy the benefits of the IPO Award. That point has already been detailed.

- Second, the broad and audacious application of the concept of Competitive Enterprise by Goldman Sachs can only be understood as an attempt to

---

[20] New York law construes ambiguous provisions against the party that drafted them. *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996). Goldman Sachs was the sole drafter of the SPA. Thus, to the extent there is any ambiguity, that ambiguity must be resolved against Goldman Sachs and in Dalal's favor. *See Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152, 161 (2d Cir. 2003).

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

prevent Dalal from working in *any* line of business in which he is likely to find employment. Thus the termination transformed the IPO Award into a non-compete agreement, one that was *unrestricted* in its scope, and hence illegal, for it violated the 'reasonableness doctrine' applicable under New York law.

- Third, even if the first two points are hypothetically assumed to permit an unrestricted and unreasonable non-compete agreement, it remains certain, clear and incontrovertible that under New York law such a non-compete must be compensated, which was not done.[21] The value of the IPO Award, even before it was taken away, by no means equaled fair wages for Dalal over the three years that Goldman Sachs sought to enforce no competition. So whether or not that *de facto* non-compete agreement was intended by the parties, agreed to beforehand or permitted by the terms and conditions of the IPO Award, the absence of just compensation (in cash or stock) and of employee choice makes the company's interpretations and conclusions stand in *violation of New York law*.

Also, the context of this case has to be seen in the light of the following statements made by Goldman Sachs, all points already mentioned. First, the documents clarified that the grants had been made for past work at Goldman Sachs. Second, the chief executive officer of Goldman Sachs wrote in a firm-wide letter to all employees that the awards constituted rewards for what employees had "done for the firm"[22] in the past. Third, Dalal's supervisor stated on at least three separate occasions that Dalal's kind of award was not be contingent on continued employment with Goldman Sachs or affected by employment with another financial institution.

Doctrines Of New York Law Not Met

Goldman Sachs' termination violates the 'reasonableness doctrine' that must be applied when considering the validity of non-compete agreements under New York law.[23] It cannot be reasonable in terms of duration, geography or scope that Core Capital is a Competitive Enterprise to Goldman Sachs. The *de facto* non-

---

[21] Whether at market wages, whether in cash or in kind (be it in stock or in the form of employment (pursuant to the 'employee choice doctrine' applicable under New York law)

[22] Goldman Sachs letter dated April 1999 (no day specified) to all employees from the top management of Goldman Sachs, included as Exhibit D.

[23] Under New York law, for the non-compete to be enforceable, the restrictive covenants or conditions must be reasonable. Consider BDO Seidman v. Hirshberg, 690 N.Y.S.2d 854, 856-57 (1999) and Post v. Merrill Lynch, Pierce, Fenner & Smith, 421 N.Y.S.2d 947, 848 (1979). Reasonableness is usually determined in terms of duration, geography or scope of activities, presumably the legal reason why Goldman Sachs included three incremental hurdles under Section 4(b)(ii).

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

compete agreement, which is what the IPO Award becomes if one concurs with Goldman Sachs point of view, is thus fatally flawed.

To concur with Goldman Sachs' broad and audacious reasoning, one must contend that Dalal cannot work in precisely those occupations in economics and finance in which he trained since 1984 through 1999. Dalal's generalized skills in economics and finance cannot be exclusively claimed one employer for its own benefit, but an accumulation of Dalal's prior education and experiences, given that Dalal had earned a bachelor's degree in economics from the University Of Delhi in India, a master's degree in international finance from Columbia University in New York and a master's degree in business administration from Harvard University in Boston, as well as worked for three years at Lehman Brothers in New York (where he received an offer to become an Associate two years before Goldman Sachs made the same offer). Dalal thus possessed a proficiency in finance that was independent of Dalal's tenure at Goldman Sachs.

In other words, Goldman Sachs' apparent contention that Dalal cannot work in any field of finance outside of Goldman Sachs *de facto* makes the IPO Award contingent on employment at Goldman Sachs (which violates express oral and written assurances made to him) or on remaining unemployed without market wages (which would violate general rights).

Anticipating this problem, Goldman Sachs correctly introduced three incremental hurdles within Section 4(b)(ii), to make it reasonable, except that its interpretation of that section, whether on a standalone read of Competitive Enterprise or a focus on the throwaway language alone, then sidesteps those very same three terms.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Second, Goldman Sachs cannot claim an exemption from the reasonableness doctrine under the 'employee choice doctrine,' when the employee and employer operate from a freedom of choice, and have an ongoing reciprocal obligation between them, in which case the reasonableness of the non-compete may be relegated or become secondary. In other words, when the employee has a choice as to whether he or she will earn a living by competing and forgoing benefits, the length, scope and breadth of the restrictions become less important. Recent case law strengthened the employee choice exemption, which conversely, strengthened the argument that when employee choice is not available, the reasonableness doctrine becomes paramount.[24]

*Argument VII:*
*Goldman Sachs Breached Covenant Of Good Faith And Fair Dealing*

The termination of the IPO Award constitutes a breach of the covenant of good faith and fair dealing implicit in all contracting. Even if one were to concur with Goldman Sachs' twisted and tortuous reasoning, or hypothetically ignore both oral and written contracts, or hypothetically ignore conflicting contractual terms, the company has a good faith obligation to adhere to its contractual commitments. Having worked as the principle associate on seven out of nine revenue generating transactions in his last twelve months (with the other two transactions distributed across the other thirty associates), and having hired Dalal in 1996 away from lucrative opportunities, there was a good faith obligation not to fail to compensate him at the time when over twenty billion was distributed across employees at the time of the IPO. Certainly there is an obligation of good faith and fair dealing incumbent upon Goldman Sachs to adhere to truth-in-advertising and truth-in-labeling of the IPO Award as one for *past* services and not contingent on future employment, and to adhere to the preamble of its *IPO Award Summary,* even if the contractual terms are narrowly assumed to stand in its favor.

In summary, *Goldman Sachs has a good faith obligation to adhere to its oral and written contracts, as well as to adhere to the letter and the spirit of the award made to employees for their (past) contribution toward what turned out to be the company's successful IPO.*

---

[24] Post v. Merrill Lynch, Pierce, Fenner & Smith, 421 N.Y.S.2d 947, 848 (1979). Further, consider that in Lucente v. International Business Machines Corp., 310 F3d 243 2d Cir. 2002, the US Court Of Appeals For The Second Circuit reversed the trial court's refusal, as a matter of law, to enforce IBM's forfeiture-for-competition provision, a case that is pertinent because Goldman Sachs' termination of the IPO Award is in this context a forfeiture-for-competition context. By insisting on the applicability of employee choice doctrine, the Second Circuit's decision clearly clarifies that the employer must have given the employee a choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture).

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

*Argument VIII:*
*Goldman Sachs' Actions Created A Quantum Meruit Claim*

Even if all the other arguments are hypothetically assumed to fail (doing so here for the sake of argument only), the termination of the IPO Award left Dalal with no compensation for exceptionally good work performed during nine months of fiscal year 1999. As a result of Goldman Sachs' contradictory actions, and breach of oral and written contracts and assurances, Dalal was denied the fruit of his labor. Dalal was not able to seek specific contingent recompense from the company or his new employer with regard to the economic loss caused by a prospective termination of the IPO Award. In light of the fact that the IPO Award was ascribed to past services already performed and assurances made by a partner of Goldman Sachs and member of its Commitment Committee, Dalal was rest assured of his retention rights to the IPO Award.

He was the principle associate on seven out of nine revenue generating transactions in his last twelve months (with the other two transactions distributed across the other thirty associates). So Dalal's executed virtually *all* the revenue-generating projects completed by the Leveraged Finance Group that year. Promising him retention of the IPO Award post-departure was clearly set forth as an incentive for Dalal to forfeit his just compensation. The quantum meruit claim is by itself far in excess of the IPO Award's current value, being entitled to a quantum meruit claim of $375,000 for the fiscal year 1999 ($450,000 less what he was paid in salary). The amount is calculated on the basis of a written job offer he received from a competing investment bank (included here as Exhibit N). In then terminating the IPO Award, Dalal was denied the fruits of his labor and the benefit of his bargain.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## SUMMARY OF ISSUES

There are six key questions that are pertinent to clarifying the contractual controversy at hand, none of which can be answered affirmatively in favor of Goldman Sachs, in any reasoned analysis. Dalal respectfully submits the following six questions to distill and summarize the eight arguments already set forth before (but not to substitute them).

1.  Is Dalal's IPO Award contingent on continued employment with or future service to Goldman Sachs?
    - The answer is unarguably no, as stated in several documents

2.  If Dalal's IPO Award is not contingent on continued employment with Goldman Sachs, can it be contingent on not accepting employment with anyone at all?
    - The answer is unarguable no, especially for reasons of reasonableness

3.  If Dalal's IPO Award permits him to accept alternative employment, does can it prohibit him to work with *any* and *all* Competitive Enterprises?
    - The answer is unarguably no, otherwise the three additional hurdles set forth in Section 4(b)(ii) of the Agreement would be moot

4.  Does the termination of Dalal's IPO Award fulfill the first, *necessary* condition under Section 4(b)(ii) of the Agreement—that Core Capital and/or India.com constitute a Competitive Enterprise?
    - The answer is unarguably no, for reasons set forth already

5.  Does the termination of Dalal's IPO Award fulfill the *sufficient* conditions of Section 4(b)(ii) of the Agreement—that Dalal's employment at Core Capital Partners or India.com constitute work that was "similar or substantially related" or work for which Dalal had "supervisory responsibility" or work that called for the "same or specialized skills" as work performed in the last twelve months of Dalal's tenure at Goldman Sachs?
    - The answer is unarguably no, for all good reasons detailed

6.  Even if questions 1 through 5 are hypothetically answered in the affirmative, is it consistent with the laws of New York to surreptitiously apply an IPO Award, made for *past* service, toward a non-compete provision on future employment, without adherence to the doctrines of reasonableness or employee choice?
    - The answer is unarguably no

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## REMEDIES SOUGHT

Dalal respectfully requests the honorable Arbitrators for a reasoned decision. Dalal also respectfully seeks the following remedies from Goldman Sachs.

- *Make-whole Recompense In Amount Of IPO Award:* First, an award the greater of cash in the amount of $234,000 or stock of Goldman Sachs in the amount of 2,123 shares, as was due to Dalal prior to termination of the IPO Award.[25] The cash amount of $234,000 reflects prices at which Dalal could have sold his shares but for Goldman Sachs' improper and intentional intransigence between June 2000 and January 2002.[26] Any ambiguity as to whether or not Dalal would have or could have or should have sold his shares at higher prices than currently available must be settled in favor of the party that had been harmed, a well-established principle of New York law.

  Alternatively, if the honorable Arbitrators find in favor of Dalal only with respect to Argument VIII, the Quantum Meruit Claim, Dalal seeks cash in the amount of $375,000, which represents his market wages for 1999 (as reflected by an offer letter from a competing investment bank in Exhibit N) less what Goldman Sachs paid him for that year.

- *Reinstitution Of Full Benefit Of Bargain:* Second, Dalal respectfully requests not only recompense of the IPO Award but reinstitution of the *full* benefit of his bargain. So in addition to the above amount, Dalal seeks no less than $375,000 in cash for being denied the benefit of his bargain with Goldman Sachs. Although the amount reflects Dalal's market wages for 1999 less what Goldman Sachs paid him for that year, it is distinct, separate and incremental to the aforementioned quantum meruit claim. Instead, it is a claim for bonus

---

[25] Dalal seeks cash compensation for each tranche of deliverable stock calculable as the difference between what the stock trades on the date of the arbitration award and the maximum price that was available to Dalal post-delivery.

- On the first anniversary of the IPO, 707 shares of stock of Goldman Sachs were deliverable to Dalal. On that date, Goldman Sachs' stock closed at $90.20 per share. For the first tranche deliverable in May 2000, the highest price recorded on the stock was $129.62 per share on September 1, 2000.
- On the second anniversary of the IPO, 708 shares of were deliverable to Dalal. On that date, Goldman Sachs' stock closed at $97.20 per share. For the second tranche deliverable in May 2001, the highest price recorded on the stock was $103.29 per share on May 22, 2001.
- On the third anniversary of the IPO, 708 shares of were deliverable to Dalal. On that date (specifically the prior trading day as the market was closed), Goldman Sachs' stock closed at $78.55 per share. For the third tranche deliverable in May 2002, the highest price recorded on the stock is $97.94 on December 26, 2003.

[26] Although the calculation of the amount is enclosed above, Dalal reserves the opportunity to submit an updated calculation of damages closer to a reasoned, written decision by the NYSE, to reflect any improvement in Goldman Sachs stock price.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

that was earned but which Dalal had given up as part of his bargain with Goldman Sachs.

Dalal worked nine months of fiscal year 1999 in virtually all the revenue generating transactions at his group. For his honest hard work, Dalal was owed not only the IPO Award but an additional big bonus as well, having executed seven of the nine revenue-generating transactions within a seventy-person group. Despite being one of the most productive associates in the whole company, Dalal gave up the bonus on the written and oral understanding that he would retain the IPO Award. It was in of itself a settlement of sorts, a 50-50 arrangement so to speak. Yet Goldman Sachs did not keep its contractual or good faith obligation to let go the modest and smaller amount of the IPO Award, failed to honor its end of the bargain, and denied Dalal the benefit of his bargain.

On Dalal's side, arbitration is not an easy matter, one that he undertakes after years of agonizing. To be forced to undertake a painful and prolonged pursuit of his dues therefore denied Dalal the benefit of his bargain. Given Goldman Sachs' blatant refusal to budge with regard to its breaches, and its improper and intentional intransigence, it is only fair for Dalal to respectfully request not only recompense of the IPO Award but reinstitution of the full benefit of his bargain.

- *Punitive Damages*: Third, Dalal seeks punitive damages as the honorable Arbitrators deem fit. First and foremost, there is a strong public interest for punitive damages. As the honorable Arbitrators may know, less than two hundred senior managers of Goldman Sachs overnight shared over twenty billion dollars from an initial public offering of the company. By contrast, the same managers, enriched by good fortune, sought to deny Dalal the fruits of his honest hard work, not a fortune, just market wages in the business. Despite their own wondrous windfall, Goldman Sachs sought to knowingly and inappropriately takeaway Dalal's small award, leaving him no alternative to recover his dues except to put his reputation at risk and seek arbitration. The public interest is especially intensified by the fact that Goldman Sachs was reminded by Dalal about the context of his departure through several letters as attached. Yet it has shown an intentional and improper disregard for the facts of the case. Even worse, it is clear and incontrovertible that Goldman Sachs denies employee dues as a standard operating procedure.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

The above facts strongly suggest a public interest in award of punitive damages. The agreement among the parties permits such a punitive award.[27] Recent case law also permits such a punitive award.[28] Punitive damages are consistent with the NASD rules of fair practice.[29]

- *Miscellaneous Costs And Fees*: Fourth, Dalal seeks costs, legal fees and interest from Goldman Sachs, as well as any other further relief that the honorable Arbitrators deem just and proper.[30]

Dated October 11, 2004

Sincerely,

*Sandeep Dalal*

Signed For Self
Sandeep Dalal    Claimant
Resident At Address Listed Above

---

[27] The parties did not explicitly agree to exclude the award of punitive damages from arbitration, and it is implicit in the agreement that punitive damages are subject to arbitration.
[28] Supreme Court stated in Mastrobuono v. Shearson Lehman Hutton, Inc., 1995 WL 86555 (March 6,1995) that New York choice of law common to many customer agreements was ambiguous and therefore it only included New York's substantive and not its procedural provisions, holding that "in the absence of contractual intent to the contrary, the FAA would preempt the Garrity rule."
[29] Article III Section 21(f) of the NASD Rules of Fair Practice.
[30] Dalal will submit legal fees and expenses incurred at the end of the arbitration process.