## EXHIBIT LIST

EXHIBIT A:   CONTRACT GOVERNING VESTED STOCK

EXHIBIT B:   REQUEST FOR MODIFICATION OF AWARD

EXHIBIT C:   AWARD, DATED MARCH 9, 2006, DATED JANUARY 20, 2006,

                      DATED DECEMBER 7, 2005

EXHIBIT D:   NYSE USER GUIDE PAGE 8, 17

EXHIBIT E:   ORIGINAL STATEMENT OF CLAIM

EXHIBIT F:   GOLDMAN RESPONSE TO REQUEST FOR MODIFICATION

EXHIBIT A:   CONTRACT GOVERNING VESTED STOCK

**Goldman Sachs**

Dalal,Sandeep
New York 85B/15
Investment Banking
Leveraged/Structured Finance (LSF)
11388

## IPO Award Statement for:  **Sandeep Dalal** *

| **Formula Restricted Stock Units** | | |
|---|---|---|
| Units Granted: | | 2,123 |
| Delivery: | *Shares* | *Approximate Date* |
| | 707 | First Anniversary of the IPO |
| | 708 | Second Anniversary of the IPO |
| | 708 | Third Anniversary of the IPO |

\*   *Your right to receive this Award and to receive the stock underlying the Award is subject to the conditions stated in the IPO Award Summary (which is enclosed) and the terms and conditions of the Goldman Sachs 1999 Stock Incentive Plan and the applicable Award Agreement (which will be available shortly after the IPO date).  You should refer to these documents for details concerning the IPO Award described above.*

The Goldman Sachs Group, Inc. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

Goldman
Sachs

April 1999


To the People of Goldman Sachs:

Goldman Sachs owes its success to our people and culture. Our people have exceptional energy, initiative, and commitment, and work in a culture marked by teamwork, client focus, integrity and a commitment to excellence.

The IPO Award recognizes this performance and those qualities, and is one of the most important steps we are taking to bind us together as the new owners of a public firm. We believe ownership will help everyone build our franchise, grow the business, and create long-term value for Goldman Sachs' shareholders.

We appreciate what you have done for the firm, congratulate you on becoming a fellow owner, and look forward to working with you as we take this historic step to become a public company.

Henry M. Paulson, Jr.
John A. Thain
John L. Thornton

**Goldman Sachs**

# IPO AWARD SUMMARY

**April 1999**

This summary is private and confidential. The securities described in this summary have not been registered with or approved by the Securities and Exchange Commission or any other regulatory body.

In order to receive your IPO Award :

- You must remain actively employed by the firm through the IPO date;

- If you are Managing Director, you must enter into a Shareholders' Agreement;

- In certain jurisdictions, you must, if asked, agree to *(i)* the transfer to our recordkeeper of certain data (e.g., name and social security/insurance number) necessary to administer your IPO Award, and *(ii)* the repayment to the firm of any amount advanced to you (e.g., for taxes) in connection with your IPO Award.

The information provided in this booklet summarizes certain important terms of your IPO Award. The *Goldman Sachs 1999 Stock Incentive Plan ("SIP")* and the *Award Agreements* govern your IPO Award. These documents, along with other important documents and information regarding your IPO Award, will be provided to you shortly after the IPO. If there are discrepancies between the information presented here and the *SIP* and *Award Agreements*, the *SIP* and *Award Agreements* will prevail.

UK employees should review the information that appears inside the back cover of this booklet.

To the Employees of Goldman Sachs:

Included with this summary booklet is a personalized statement of your individual IPO Award. The amount and nature of your award should be treated confidentially and not discussed with other employees or with anyone outside of the firm, with the exception of your immediate family members and your financial advisors.

Please read this summary booklet carefully for an overview of your IPO Award. Any questions that you may have regarding your IPO Award should be directed to either your manager or your divisional administrator. In addition, the firm's IPO Web page presents helpful information regarding the IPO, including responses to many frequently asked questions.

I congratulate you on being part of this historic event.


Bruce M. Larson
Human Resources Department

# Formula Restricted Stock Units ("Formula RSUs")

## Your IPO Award

The attached personalized IPO Award Statement sets forth the number of Formula Restricted Stock Units ("Formula RSUs") that will be granted to you on the IPO date. In general, your Formula RSU Award was determined based on your compensation and years of service with the firm.

Each Formula RSU represents your right to receive, on the applicable delivery date, one share of common stock ("Common Stock") of The Goldman Sachs Group, Inc. ("GS Inc."), assuming the conditions set forth in the Award Agreement are satisfied. Until the Common Stock is actually delivered, you have no rights as a shareholder of GS Inc.

## Delivery of Shares

In general, the shares of Common Stock underlying your Formula RSUs will be deliverable in approximately equal installments on or about each of the first, second and third anniversaries of the IPO date. The Formula RSUs are "vested" in the sense that you do not need to remain employed by the firm in order to receive the underlying Common Stock, but the underlying Common Stock **will not** be delivered to you if (among other things):

- Your employment is terminated for Cause or you engage in activities that constitute Cause;

- You violate the non-competition or non-solicitation provisions of the Award Agreement; or

- You fail to provide requested certification to the firm to the effect that you have satisfied the conditions of the Award Agreement.

If, after delivery of Common Stock, the firm determines that the conditions of the Award Agreement were in fact not satisfied, you may be required to repay the value of such Common Stock to the firm.

If you are in the firm's Analyst Program and you leave the firm having successfully completed that Program, delivery of the Common Stock underlying your Formula RSUs may be accelerated. Please consult your divisional administrator for further information.

Delivery of the Common Stock underlying your Formula RSUs will be effected by book-entry credit to a custody account that you will be required to open with The Chase Manhattan Bank ("Chase"). The information you will receive shortly after the IPO will include the necessary Chase account documentation. By

opening the account, you will acknowledge your acceptance of the terms and conditions of the Award Agreement. There is no need for you to open a Goldman Sachs brokerage account, nor will you be able to use an existing Goldman Sachs brokerage account in lieu of the Chase custody account.

The firm will deliver Common Stock to you only if you satisfy any applicable withholding taxes and provide any consents that the firm determines are necessary or advisable. In general, to satisfy any withholding tax liability you may have, you may pay cash to the firm or, if the firm so permits, you may elect to have the firm withhold shares of Common Stock. Additional details regarding withholding taxes will be provided to you in advance of the first delivery date.

## Dividend Equivalent Payments

When GS Inc. pays a dividend on its outstanding Common Stock, you will receive a "dividend equivalent" payment with respect to your outstanding Formula RSUs equal to the regular cash dividend that would have been paid if the underlying shares of Common Stock had already been delivered to you. In general, these "dividend equivalent" payments will be treated as additional compensation income to you and may be subject to withholding tax.

## Selling Your Shares

Your Formula RSUs will not be transferable (other than in the event of your death) and the underlying Common Stock will not be transferable until delivered. Upon delivery, the Common Stock underlying your Formula RSUs generally will be transferable, subject to certain employee trading restrictions that the firm intends to implement (and, in the case of Managing Directors, the terms of the Shareholders' Agreement). In the near future, you will receive more specific information regarding employee trading restrictions.

## Other Information

In some instances, the firm may deliver cash in lieu of Common Stock (e.g., in the case of exchange controls, foreign investment limitations or other local restrictions).

If you die while any Formula RSUs are outstanding, the firm will deliver the underlying Common Stock as soon as practicable to your designated beneficiary or your estate. The information you receive shortly after the IPO will include a form to designate your beneficiary for this purpose.

If, within 18 months after a Change in Control of the firm, you are terminated without Cause or voluntarily leave the firm for Good Reason, the Common Stock underlying your outstanding Formula RSUs will be delivered to you.

Nothing in the Award Agreement or the SIP will provide you with the right to continued employment or alter any terms and conditions of your employment with the firm.

In general, any disputes relating to the terms of the Award Agreement will be finally settled by arbitration in New York City, as more fully explained in the Award Agreement.

# Tax Information

The following summarizes the current tax treatment of your IPO Award. These summaries are not intended to be tax advice. We urge you to consult your own independent tax advisor.

In addition to the tax summaries below, it should be noted that employees who are neither citizens nor residents of the United States will be subject to a 30% United States withholding tax (which may be reduced by an applicable tax treaty) on actual dividend distributions on Common Stock, and will be exempt from United States tax on gain from the sale of shares of Common Stock.

## The Americas and Caribbean

**Employees Subject to Taxation in Argentina**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be exempt from tax in Argentina.

**Employees in Bermuda**. Your Formula RSUs, shares of Common Stock delivered to you in respect of your RSUs, dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock, and gain on subsequent sales of shares of Common Stock will not be subject to income tax in Bermuda.

**Employees Subject to Taxation in Brazil**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

**Employees Subject to Taxation in Canada**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly. Only 75% of capital gains will be included in income for tax purposes.

**Employees in the Cayman Islands**. The Cayman Islands do not impose income or social security taxes.

**Employees Subject to Taxation in Mexico**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation.

**Employees Subject to Taxation in the United States**. Your Formula RSUs will not be subject to U.S. federal, state or city income taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs generally will be subject to tax at each delivery date, in the same manner as your other compensation.

Formula RSUs will be subject to FICA (social security and Medicare) taxes at grant and not at delivery of shares of Common Stock. The Firm will advance the FICA taxes you owe at grant against future repayment through FICA-based withholdings from your other compensation for the rest of the year, including any year-end 1999 bonus (or analyst 1999 departure bonus) payment you may receive. However, if you leave the firm for any reason before this advance has been repaid, you will be required to pay the balance at that time.

Dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock generally will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as short-term or long-term capital gain or loss depending on your holding period.

## Europe and Africa

**Employees Subject to Taxation in France**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

**Employees Subject to Taxation in Germany**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock held for longer than 12 months after delivery will be exempt from German taxation as capital gain, and loss on subsequent sales will not be deductible.

**Employees Subject to Taxation in Italy**. Your Formula RSUs and the shares of Common Stock you receive in respect of your Formula RSUs will be exempt from Italian taxation. Dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be subject to tax at 12.5%. The cost basis in your shares of Common Stock will equal the fair market value of the shares on the date they were delivered to you.

**Employees Subject to Taxation in Russia**. Your Formula RSUs will not be subject to taxation at grant. We anticipate that the firm will pay you cash in lieu of shares of Common Stock on the delivery dates specified in your Formula RSUs. Such cash payments, and dividend equivalent amounts paid to you prior to such delivery dates, will be subject to tax when received, in the same manner as your other compensation.

**Employees Subject to Taxation in South Africa**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be exempt from South African taxation as capital gain, and loss on subsequent sales will not be deductible.

**Employees Subject to Taxation in Spain**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, in the same manner as your other compensation. However, shares of Common Stock delivered after the second anniversary of the IPO will be taxed only to the extent of 70% of the value on such dates. Dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

**Employees Subject to Taxation in Sweden**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

**Employees Subject to Taxation in Switzerland**. Your Formula RSUs will be subject to Swiss income and social security (pension insurance and unemployment) taxation at grant, in an amount equal to the IPO share price discounted according to Swiss law at six percent per annum to take account of the deferred delivery schedule for the shares of Common Stock. If you are not (and are not married to) a Swiss citizen or C-permit holder, you will be subject to withholding at grant. The Firm will advance the Swiss taxes you owe in respect of your Formula RSUs at grant, and you will be required to repay the advance no later than the delivery date of the shares of Common Stock to which such taxes relate. If you leave the firm for any reason before this advance has been repaid, you will be required to pay the remaining balance at that time. If you forfeit any Formula RSUs, you will be able to deduct the appropriate amount on which you were taxed at grant.

Dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be exempt from Swiss taxation as capital gain, and loss on subsequent sales will not be deductible.

**Employees Subject to Taxation in the United Kingdom**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

## Asia and Australia

**Employees Subject to Taxation in Australia**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, in the same manner as your other compensation. Dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be treated as taxable capital gain subject to tax at ordinary income rates; if you hold your shares of Common Stock more than 12 months, your cost basis for determining gain (but not loss) will be indexed for inflation.

**Employees Subject to Taxation in Hong Kong**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be exempt from Hong Kong taxation as capital gain, and loss on subsequent sales will not be deductible.

**Employees Subject to Taxation in India**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

**Employees Subject to Taxation in Japan**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

**Employees Subject to Taxation in Korea**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain or loss from subsequent sales of shares of Common Stock will be treated as capital gain or loss and taxed accordingly.

**Employees Subject to Taxation in the People's Republic of China (PRC)**. Your Formula RSUs will not be subject to taxation at grant. We anticipate that the firm will pay you cash in lieu of shares of Common Stock on the delivery dates specified in your Formula RSUs. Such cash payments, and dividend equivalent amounts paid to you prior to such delivery dates, will be subject to tax when received, in the same manner as your other compensation.

**Employees Subject to Taxation in Singapore**. Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula

RSUs will be subject to tax at each delivery date, in the same manner as your other compensation. Your shares of Common Stock will not be subject to Central Provident Fund contributions requirements. Dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be exempt from Singapore taxation as capital gain, and loss on subsequent sales will not be deductible.

**Employees Subject to Taxation in Taiwan (ROC).**  Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be exempt from taxation in Taiwan.

**Employees Subject to Taxation in Thailand.**  Your Formula RSUs will not be subject to taxation at grant. Instead, the fair market value of shares of Common Stock you receive in respect of your Formula RSUs will be subject to tax at each delivery date, and dividend equivalent amounts paid to you prior to your receipt of shares of Common Stock will be subject to tax when received, in the same manner as your other compensation. Gain from subsequent sales of shares of Common Stock will be exempt from tax in Thailand if the proceeds are not remitted into Thailand during the year of sale.

FOR UK EMPLOYEES ONLY

Approved on behalf of The Goldman Sachs Group, Inc. ("GS Inc.") for distribution in the UK by Goldman Sachs International, regulated by the SFA. This offer is being made to persons within applicable exemptions of the Public Offers of Securities Regulations 1995 and, accordingly, no offer is being made to the public.

The price of GS Inc. common stock and the income from such stock (if any) can fluctuate and may be affected by changes in the exchange rate for US Dollars. Levels and bases of taxation may change from time to time. Investors should consult their own tax advisors in order to understand tax consequences. GS Inc. has a material interest in the common stock and the investments that are the subject of this document. GS Inc. does not have a permanent place of business in the UK and is not authorised under the Financial Services Act 1986. A different regulatory regime, including compensation arrangements, from that applicable in the UK will be applicable for any dealings with GS Inc.

# THIS BOOKLET CONTAINS:

1999 FORMULA RSU AWARD AGREEMENT

[This page intentionally left blank]

## THE GOLDMAN SACHS 1999 STOCK INCENTIVE PLAN
## 1999 FORMULA RSU AWARD

This Award Agreement sets forth the terms and conditions of an Award of restricted stock units ("RSUs") granted to you under The Goldman Sachs 1999 Stock Incentive Plan (the "Plan").

1.    The Plan. This Award is made pursuant to the Plan, the terms of which are incorporated in this Award Agreement. Capitalized terms used in this Award Agreement which are not defined in this Award Agreement, or in the attached Glossary of Terms, have the meanings as used or defined in the Plan.

2.    Award. The number of RSUs subject to this Award is set forth in a statement separately delivered to you. An RSU constitutes an unfunded and unsecured promise of GS Inc. to deliver (or cause to be delivered) to you, subject to the terms of this Award Agreement, a share of Common Stock (the "Share") (or cash equal to the Fair Market Value thereof) on a Delivery Date as provided herein. Until such delivery, you have only the rights of a general unsecured creditor and no rights as a shareholder of GS Inc. THIS AWARD IS SUBJECT TO ALL TERMS AND PROVISIONS OF THE PLAN AND THIS AWARD AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE ARBITRATION AND CHOICE OF FORUM PROVISIONS SET FORTH IN PARAGRAPH 15. BY OPENING THE CUSTODY ACCOUNT REFERRED TO IN PARAGRAPH 3(a), YOU WILL HAVE CONFIRMED YOUR ACCEPTANCE OF THE TERMS AND CONDITIONS OF THIS AWARD AGREEMENT.

3.    Delivery.

(a)    In General. Except as provided below in this Paragraph 3 and in Paragraphs 4, 6, 9 and 10, Shares shall be delivered in equal installments (subject to rounding in the discretion of the Committee to avoid the delivery of fractional Shares) on each Delivery Date. The Firm may deliver cash in lieu of all or any portion of the Shares otherwise deliverable on each such Delivery Date. Unless otherwise determined by the Committee, or as otherwise provided in this Award Agreement, delivery of Shares shall be effected by book-entry credit to a custody account (the "Custody Account") maintained by you with The Chase Manhattan Bank or such successor custodian as may be designated by GS Inc. No delivery of Shares shall be made unless you have timely established the Custody Account. You shall be the beneficial owner of any Shares properly credited to the Custody Account. You shall have no right to any dividend or distribution with respect to such Shares if the record date for such dividend or distribution is prior to the date the Custody Account is properly credited with such Shares.

(b)    Death. Notwithstanding any other provision of this Award Agreement, if you die prior to the last Delivery Date, and provided your rights in respect of any outstanding RSUs have not previously terminated, the Shares (or cash in lieu of all or any portion thereof) corresponding to your outstanding RSUs shall be delivered as soon as practicable thereafter to your designated beneficiary (or, if none, your estate).

NY12531: 244963.13

4. <u>Termination of RSUs and Non-Delivery Upon Certain Other Events</u>.

(a)    Unless the Committee determines otherwise, and except as provided in Paragraph 6, your rights in respect of any outstanding RSUs shall immediately terminate and no Shares (or cash) shall be delivered in respect of such RSUs (i) if (A) prior to the relevant Delivery Date, your Employment with the Firm is terminated for Cause, (B) you engage in conduct specified in Paragraph 4(b), or (C) you fail to provide the representations and certifications required under Paragraph 4(c) or (ii) at the time specified in Paragraph 4(d).

(b)    You will have engaged in conduct specified in this Paragraph 4(b) if, as determined by the Committee, at any time prior to the relevant Delivery Date:

(i)    any of the events that constitute Cause has occurred; or

(ii)    in the event you are categorized by the Firm as an exempt employee (or the equivalent outside the United States) on the relevant Delivery Date or were so characterized on the date of termination of your Employment, you (A) form, or acquire a 5% or greater equity ownership, voting or profit participation interest in, any Competitive Enterprise, or (B) associate (including, but not limited to, association as an officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise and in connection with such association engage in, or directly or indirectly manage or supervise personnel engaged in, any activity (1) which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Firm, (2) for which you had direct or indirect managerial or supervisory responsibility at the Firm or (3) which calls for the application of the same or similar specialized knowledge or skills as those utilized by you in your activities with the Firm, at any time during the one-year period immediately prior to termination of your Employment (or, in the case of an action taken prior to termination of your Employment, during the one-year period immediately prior to such action), and, in any such case, irrespective of the purpose of the activity or whether the activity is or was in furtherance of advisory, agency, proprietary or fiduciary business of either the Firm or the Competitive Enterprise. (By way of example only, this provision would preclude an "advisory" investment banker from joining a leveraged-buyout firm, a research analyst from becoming a proprietary trader or joining a hedge fund, or an information systems professional from joining a management or other consulting firm and providing information technology consulting services or advice to any Competitive Enterprise.); or

(iii)    in the event you are categorized by the Firm as an exempt employee (or the equivalent outside the United States) on the relevant Delivery Date or were so characterized on the date of termination of your Employment, you in any manner, directly or indirectly, (A) Solicit any Client to transact business with a Competitive Enterprise or to reduce or refrain from doing any business with the Firm or (B) interfere with or damage (or attempt to interfere with or damage) any relationship between the Firm and any such Client or (C) Solicit any person who is an employee of the Firm to resign from the Firm or to apply for or accept employment with any Competitive Enterprise; or

(iv)    you attempt to have any dispute under this Award Agreement resolved in any manner that is not provided for by Paragraph 15.

(c)    You must certify to GS Inc., in accordance with procedures established by the Committee, with respect to each relevant Delivery Date that you have complied, and as of the relevant Delivery Date will have complied, with all the terms and conditions of this Award Agreement. By accepting the delivery of Shares (or cash) under this Award Agreement, you shall be deemed to have represented and certified at such time that you have complied with all the terms and conditions of this Award Agreement.

(d)    Unless the Committee determines otherwise, if the Delivery Date in respect of any outstanding RSUs occurs, and Shares (or cash) with respect to such RSUs would be deliverable under the terms and conditions of this Award Agreement, except that you have not complied with the conditions or your obligations under Paragraphs 3(a) and 4(c), all of your rights with respect to such RSUs shall terminate, and no Shares (or cash) shall be delivered, upon the expiration of the fiscal year of GS Inc. in which such Delivery Date occurs.

5.    <u>Repayment</u>. If, following the delivery of Shares (or cash) with respect to any Delivery Date, the Committee determines that all terms and conditions of this Award Agreement in respect of such delivery were not satisfied, the Firm shall be entitled to receive, and you shall be obligated to pay the Firm immediately upon demand therefor, the Fair Market Value of the Shares (determined as of the relevant Delivery Date) and the amount of cash (to the extent that cash was delivered in lieu of Shares) that were delivered with respect to such Delivery Date and without reduction for any Shares (or cash delivered in lieu of all or any portion thereof) applied to satisfy withholding tax or other obligations in respect of such Shares (or cash).

6.    <u>Change in Control</u>. Notwithstanding anything to the contrary in this Award Agreement, in the event a Change in Control shall occur and within 18 months thereafter the Firm terminates your Employment without Cause or you terminate Employment with the Firm for Good Reason, all Shares underlying outstanding RSUs with respect to which your rights have not terminated (or the Fair Market Value of such Shares in cash) shall be delivered.

7.    <u>Dividend Equivalents</u>. Prior to the delivery of Shares (or cash in lieu thereof) pursuant to this Award Agreement, at or after the time of distribution of any regular cash dividend paid by GS Inc. in respect of the Common Stock, you shall be entitled to receive an amount in cash (less applicable withholding) equal to such regular dividend payment that would have been made in respect of the Shares not yet delivered, as if the Shares had been actually delivered; <u>provided</u>, that no payment in respect of RSUs shall be made if, prior to the time such payment is due, your rights with respect to such RSUs have previously terminated under this Agreement.

8.    <u>Non-transferability; Beneficiary Designation</u>. Except as may otherwise be provided by the Committee, the limitations set forth in Section 3.4 of the Plan shall apply. Any assignment in violation of the provisions of this Paragraph 8 shall be void. You may designate, in accordance with procedures established by the Committee, a beneficiary or beneficiaries to receive all or part of the

amounts to be paid under this Award Agreement in the event of your death. A designation of a beneficiary may be replaced by a new designation or may be revoked by you at any time in accordance with procedures established by the Committee. If you die without having properly designated a beneficiary, any amounts payable upon your death shall be distributed to your estate. If there is any question as to the legal right of any beneficiary to receive payment of amounts under this Award Agreement, the amounts in question may be paid to your estate, in which event the Firm shall have no further liability to anyone with respect to such amounts. A beneficiary or estate shall have no rights under this Award Agreement other than the right, subject to the immediately preceding sentence, to receive such amounts, if any, as may be payable under this Paragraph 8.

       9.      Withholding, Consents and Legends.

      (a)     The delivery of Shares is conditioned on your satisfaction of any applicable withholding taxes (in accordance with Section 3.2 of the Plan, provided that the Committee may determine not to apply the minimum withholding rate specified in Section 3.2.2 of the Plan).

      (b)     Your rights in respect of the RSUs are conditioned on the receipt to the full satisfaction of the Committee of any required consents (as defined in Section 3.3 of the Plan) that the Committee may determine to be necessary or advisable (including, without limitation, your consenting (i) to the Firm's supplying to any third party recordkeeper of the Plan such personal information as the Committee deems advisable to administer the Plan and (ii) to deductions from your wages, or other arrangement satisfactory to the Committee, to reimburse the Firm for advances made on your behalf to satisfy certain withholding and other tax obligations in connection with this Award).

      (c)     If you are or become a Managing Director, your rights in respect of the RSUs are conditioned on your becoming a party to any shareholders' agreement to which other similarly situated employees of the Firm are a party.

      (d)     GS Inc. may affix to Certificates representing Shares issued pursuant to this Award Agreement any legend that the Committee determines to be necessary or advisable (including to reflect any restrictions to which you may be subject under a separate agreement with GS Inc.). GS Inc. may advise the transfer agent to place a stop order against any legended Shares.

      10.     Right of Offset. GS Inc. (and any of its affiliates and subsidiaries) shall have the right to offset against the obligation to deliver Shares (or cash) under this Award Agreement any outstanding amounts (including, without limitation, travel and entertainment or advance account balances, loans, or amounts repayable to the Firm pursuant to tax equalization, housing, automobile or other employee programs) you then owe to the Firm and any amounts the Committee otherwise deems appropriate pursuant to any tax equalization policy or agreement.

      11.     No Rights to Continued Employment. Nothing in this Award Agreement or the Plan shall be construed as giving you any right to continued Employment by the Firm or affect any right which the Firm may have to terminate or alter the terms and conditions of your Employment.

12.    Successors and Assigns of GS Inc. The terms and conditions of this Award Agreement shall be binding upon and shall inure to the benefit of GS Inc. and its successors and assigns.

13.    Committee Discretion. The Committee shall have full discretion with respect to any actions to be taken or determinations to be made in connection with this Award Agreement, and its determinations shall be final, binding and conclusive.

14.    Amendment. The Committee reserves the right at any time to amend the terms and conditions set forth in this Award Agreement, and the Board may amend the Plan in any respect; provided that, notwithstanding the foregoing and Sections 1.3.2(f), 1.3.2(g) and 3.1 of the Plan, no such amendment shall materially adversely affect your rights and obligations under this Award Agreement without your consent (or the consent of your beneficiary or estate, if such consent is obtained after your death), except that the Committee reserves the right to accelerate the delivery of the Shares and in its discretion provide that such Shares may not be transferable until the relevant Delivery Dates (and that in respect of such Shares you may remain subject to the repayment obligations of Paragraph 5 in the circumstances under which the Shares would not have been delivered pursuant to Section 4). Any amendment of this Award Agreement shall be in writing signed by the Chief Executive Officer of GS Inc. or his or her designee.

15.    Arbitration; Choice of Forum. (a) Any dispute, controversy or claim between the Firm and you, arising out of or relating to or concerning the Plan or this Award Agreement, shall be finally settled by arbitration in New York City before, and in accordance with the rules then obtaining of, the New York Stock Exchange, Inc. (the "NYSE") or, if the NYSE declines to arbitrate the matter, the American Arbitration Association (the "AAA") in accordance with the commercial arbitration rules of the AAA. Prior to arbitration, all claims maintained by you must first be submitted to the Committee in accordance with claims procedures determined by the Committee. This paragraph is subject to the provisions of clauses (b) and (c) below.

(b)    **THE FIRM AND YOU HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE CITY OF NEW YORK OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO OR CONCERNING THE PLAN OR THIS AWARD AGREEMENT THAT IS NOT OTHERWISE ARBITRATED OR RESOLVED ACCORDING TO PARAGRAPH 15(a) OF THIS AWARD AGREEMENT.** This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. The Firm and you acknowledge that the forum designated by this Paragraph 15(b) has a reasonable relation to the Plan, this Award Agreement, and to your relationship with the Firm. Notwithstanding the foregoing, nothing herein shall preclude the Firm from bringing any action or proceeding in any other court for the purpose of enforcing the provisions of this Paragraph 15.

(c)    The agreement by you and the Firm as to forum is independent of the law that may be applied in the action, and you and the Firm agree to such forum even if the forum may under applicable law choose to apply non-forum law. You and the Firm hereby waive, to the fullest extent permitted by applicable law, any objection which you or the Firm now or hereafter may have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding in any court referred to in

01

Paragraph 15(b). You and the Firm undertake not to commence any action arising out of or relating to or concerning this Award Agreement in any forum other than a forum described in this Paragraph 15. You and the Firm agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit, action or proceeding in any such court shall be conclusive and binding upon you and the Firm.

(d)    You irrevocably appoint the General Counsel of GS Inc. as your agent for service of process in connection with any action or proceeding arising out of or relating to or concerning this Award Agreement which is not arbitrated pursuant to the provisions of Paragraph 15(a), who shall promptly advise you of any such service of process.

(e)    You hereby agree to keep confidential the existence of, and any information concerning, a dispute described in this Paragraph 15, except that you may disclose information concerning such dispute to the arbitrator or court that is considering such dispute or to your legal counsel (provided that such counsel agrees not to disclose any such information other than as necessary to the prosecution or defense of the dispute).

(f)    You recognize and agree that prior to the grant of this Award you have no right to any benefits hereunder. Accordingly, in consideration of the receipt of this Award, you expressly waive any right to contest the amount of this Award, terms of this Award Agreement, any determination, action or omission hereunder or under the Plan by the Committee, GS Inc. or the Board, or any amendment to the Plan or this Award Agreement (other than an amendment to which your consent is expressly required by Paragraph 14).

16.    Governing Law. **THIS AWARD SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.**

17.    Headings. The headings in this Award Agreement are for the purpose of convenience only and are not intended to define or limit the construction of the provisions hereof.

IN WITNESS WHEREOF, GS Inc. has caused this Award Agreement to be duly executed and delivered as of May 7, 1999.

THE GOLDMAN SACHS GROUP, INC.

By: _____
Name: Robert J. Katz
Title: Executive Vice President

*Glossary of Terms*

Solely for purposes of the 1999 Formula RSU Award Agreement granted under the Goldman Sachs 1999 Stock Incentive Plan (the "Plan"), the following terms shall have the meanings set forth below. Capitalized terms not defined in this Glossary of Terms shall have the meanings as used or defined in the applicable Award Agreement or the Plan.

**"Cause"** means (i) your conviction, whether following trial or by plea of guilty or nolo contendere (or similar plea), in a criminal proceeding (A) on a misdemeanor charge involving fraud, false statements or misleading omissions, wrongful taking, embezzlement, bribery, forgery, counterfeiting or extortion, or (B) on a felony charge or (C) on an equivalent charge to those in clauses (A) and (B) in jurisdictions which do not use those designations; (ii) your engaging in any conduct which constitutes an employment disqualification under applicable law (including statutory disqualification as defined under the Exchange Act); (iii) your willful failure to perform your duties to the Firm; (iv) your violation of any securities or commodities laws, any rules or regulations issued pursuant to such laws, or the rules and regulations of any securities or commodities exchange or association of which GS Inc. or any of its subsidiaries or affiliates is a member; (v) your violation of any Firm policy concerning hedging or confidential or proprietary information, or your material violation of any other Firm policy as in effect from time to time; (vi) your engaging in any act or making any statement which impairs, impugns, denigrates, disparages or negatively reflects upon the name, reputation or business interests of the Firm; or (vii) your engaging in any conduct detrimental to the Firm. The determination as to whether "Cause" has occurred shall be made by the Committee in its sole discretion. The Committee shall also have the authority in its sole discretion to waive the consequences under the Plan or any Award Agreement of the existence or occurrence of any of the events, acts or omissions constituting "Cause".

**"Change in Control"** means the consummation of a merger, consolidation, statutory share exchange or similar form of corporate transaction involving GS Inc. (a "Reorganization") or sale or other disposition of all or substantially all of GS Inc.'s assets to an entity that is not an affiliate of GS Inc. (a "Sale"), that in each case requires the approval of GS Inc.'s stockholders under the law of GS Inc.'s jurisdiction of organization, whether for such Reorganization or Sale (or the issuance of securities of GS Inc. in such Reorganization or Sale), unless immediately following such Reorganization or Sale, either: (i) at least 50% of the total voting power (in respect of the election of directors, or similar officials in the case of an entity other than a corporation) of (A) the entity resulting from such Reorganization, or the entity which has acquired all or substantially all of the assets of GS Inc. in a Sale (in either case, the "Surviving Entity"), or (B) if applicable, the ultimate parent entity that directly or indirectly has beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, as such Rule is in effect on the date of adoption of the Plan) of 50% or more of the total voting power (in respect of the election of directors, or similar officials in the case of an entity other than a corporation) of the Surviving Entity (the "Parent Entity"), is represented by GS Inc.'s securities (the "GS Inc. Securities") that were outstanding immediately prior to such Reorganization or Sale (or, if applicable, is represented by shares into which such GS Inc. Securities were converted pursuant to such Reorganization or Sale) or (ii) at least 50% of the members of the board of directors (or similar officials in the case of an entity other than a

corporation) of the Parent Entity (or, if there is no Parent Entity, the Surviving Entity) following the consummation of the Reorganization or Sale were, at the time of the Board's approval of the execution of the initial agreement providing for such Reorganization or Sale, individuals (the "Incumbent Directors") who either (1) were members of the Board on the date of the Award or (2) became directors subsequent to the date of the Award and whose election or nomination for election was approved by a vote of at least two-thirds of the Incumbent Directors then on the Board (either by a specific vote or by approval of GS Inc.'s proxy statement in which such persons are named as a nominee for director).

"**Client**" means any client or prospective client of the Firm to whom you provided services, or for whom you transacted business, or whose identity became known to you in connection with your relationship with or employment by the Firm.

"**Competitive Enterprise**" means a business enterprise that (i) engages in any activity, or (ii) owns or controls a significant interest in any entity that engages in any activity, that, in either case, competes anywhere with any activity in which the Firm is engaged. The activities covered by the previous sentence include, without limitation, financial services such as investment banking, public or private finance, lending, financial advisory services, private investing (for anyone other than you and members of your family), merchant banking, asset or hedge fund management, insurance or reinsurance underwriting or brokerage, property management, or securities, futures, commodities, energy, derivatives or currency brokerage, sales, lending, custody, clearance, settlement or trading.

"**Delivery Date**" means the first day of each Window Period that begins on or immediately follows each of the first, second and third anniversaries of the consummation of the initial public offering of Shares.

"**Good Reason**" means (i) as determined by the Committee, a materially adverse alteration in your position or in the nature or status of your responsibilities from those in effect immediately prior to the Change in Control, or (ii) the Firm's requiring your principal place of Employment to be located more than seventy-five (75) miles from the location where you are principally Employed at the time of the Change in Control (except for required travel on the Firm's business to an extent substantially consistent with your customary business travel obligations in the ordinary course of business prior to the Change in Control).

"**Solicit**" means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity, in any manner, to take or refrain from taking any action.

"**Window Period**" means a period designated by the Committee during which employees of the Firm generally are permitted to purchase or sell Shares.

[This page intentionally left blank]

EXHIBIT B:   REQUEST FOR MODIFICATION OF AWARD

VIA EMAIL AND MAIL

2111 Wisconsin Avenue, NW
Washington, DC 20007
(202) 342-1205 | sandeep@post.harvard.edu

February 8, 2006

Mr. David Carey                     Cc:   Mr. Robin Fessel
NYSE Arbitration Department               Sullivan & Cromwell
20 Broad Street - 5th Floor               125 Broad Street
New York, NY 10005 | Fax (212) 656-2727   New York, NY 10004 | Fax (212) 558-3588

RE: REQUEST FOR MODIFICATION OF AWARD

Dear Mr. Carey:

       Thank you very much for your fax of January 20, 2006, delivering to me the revised
award on the matter #2004-015821 *Sandeep Dalal v. Goldman Sachs*. This completes the task
alluded to in your fax of December 5, 2005, which left for later a revision to the award.
       Therefore, pursuant to procedures set forth in the NYSE's *Arbitration Procedures:
January 2001*, I submit this request to modify the amount of the award made to me.[1] As required
by those rules, I am not seeking a revision of the award, merely a modification of it. I make the
request on the strength of well-settled New York law, which provides that a party injured by a
breach of contract is entitled to that amount of damages necessary to place the party in as good a
position as it would have been in had the other party fully performed the contract. (See
*Terwilliger, 206 F.3d at 248*). The contract is clear on that score and the honorable arbitrators
must award me no less than 2,123 shares of Goldman Sachs (or cash in the amount of $301,466).
Furthermore, as requested in my Statement of Claim, I am owed interest. Under New York Law,
pre-judgment interest is normally recoverable as a matter of right in an action at law for breach
of contract (*Graham v. James, 144 F.3d at 239*), which all would agree accrues at 9%. I am
therefore owed an additional 67% of the original award, which is 1,437 shares or $204,092.
       Therefore, consistent with the award in favor of Sandeep Dalal, and well settled New
York law, Dalal is owed 3,560 shares of Goldman Sachs, or cash in the amount of $505,558.
Alternatively, it would be a manifest disregard of applicable law for the honorable arbitrators to
award an amount less than the greater of the two. The current award certainly is.
       Sincerely submitted,

       Sandeep Dalal

---

[1] To quote from the NYSE *Arbitration Procedures: January 2001*: "This authority is derived from the arbitration
laws...that allow a party to request a modification of award, typically within 20 days after the award was issued.
New York's arbitration law is a good illustration of the award modification process. Under Section 7509 of the New
York Civil Practice Law and Rules, a party must request modification of an award in writing, within 20 days after
delivery of the award. This request is sent to the SRO administrator, and to the other parties, who have 10 days to
reply. After the other parties reply (or the 10-day period expires), the arbitrators have 30 days to act on the
modification request. The arbitrators will either deny the request to modify their award, or issue a written
modification of their award...every state arbitration law allows courts to correct such technical mistakes in awards."

VIA FAX AND MAIL

2111 Wisconsin Avenue, NW
Washington, DC 20007
(202) 342-1205 | sandeep@post.harvard.edu

December 1, 2005

Mr. David Carey                         Cc:    Mr. Robin Fessel
NYSE Arbitration Department                    Sullivan & Cromwell
20 Broad Street - 5th Floor                    125 Broad Street
New York, NY 10005                             New York, NY 10004
Fax (212) 656-2727                             Fax (212) 558-3588

RE: REQUEST FOR CONFIDENTIALITY UNDER RULE 627(f) and 629(c)

Dear Mr. Carey:

      With a decision imminent in a matter of weeks, I respectfully request the Director of Arbitration to not publish my name upon delivery of the decision on *Sandeep Dalal v. Goldman Sachs*. My request for confidentiality is provided for by NYSE Rule 627(f) and 629(c), one specifically created to balance the public purpose of making the amount and nature of the decision public while affording me the protection of the Uniform Code of Arbitration. **Arbitration rules have long recognized that since individual employees at institutions such as Goldman Sachs are not named upon publication of an award, the individual bringing a claim too should receive that same courtesy.**

By way of background, my request was first made to the NYSE in August 2004 and repeated in every filing thereafter.[1] I have thus brought this arbitration upon reasonable reliance on the NYSE's acceptance of my request, one consistent with the confidentiality explicitly provided by the Uniform Code of Arbitration. Furthermore, even under the strictest interpretation of Rule 627(f) and 629(c), I am eligible.

- Firstly, and foremost, Rule 627(f) protects all individual claims, not merely customers of brokerages. When NYSE Rules intend to refer to brokerage customers only, those rules use the phrase "*public* customer" specifically.
- Secondly, the Director of Arbitration has already deemed me to be a "customer," but one making an "industry claim," at the time fees had been assessed on this dispute.[2] So the NYSE has already implicitly classified me as a "customer" of some sort. It presumably did so because NYSE Rules are oddly enough silent about "employee" disputes and the only other categories of claims are that of an "industry claimant," also referred to as a "member," or a customer making a "customer claim," also referred to as a "public customer," neither of which applies to this dispute.[3] Clearly

there is a method to those references, and if I were to be excluded from Rule 627(f), the phrase '*public* customer' would have been used.

- Fourthly, the NYSE should have recognized upfront that its rules make no mention of employee disputes, enabling me to take the matter to the AAA (which does provide full confidentiality).[4] Given that the NYSE accepted this employee dispute, fairness demands that its rules be read to cover employees as well, not just brokerage customers.
- Fifthly, by disclosing only the amount and the nature of claim, the public purpose will not be comprised.[5] Indeed, it is the only option consistent with federal arbitration law.

In sum, given that the NYSE Rules provide no other classification of me other than as a customer making an industry claim (but a customer nevertheless), given that the NYSE's acceptance of this dispute comes with the implicit assurance that its rules would be read to cover employees, given my reasonable reliance on the NYSE's acceptance of my point of view for over a year now and given the fact that individuals at Goldman Sachs would not have their names published but only I face that unequal remedy, I request my name not be published at the time of the award.

Sincerely,

Sandeep Dalal

---

[1] From the very first communications with Mr. Robert Kreuter, from as early as August 2004, I have emphasized my desire for confidentiality. I repeated the need for confidentiality in every letter, including specifically citing Rule 627(f) in my Statement of Claim and in my Reply to Respondent.

[2] Letters were exchanged in October and November 2004. Oddly enough, the NYSE Rules provided no other classification for an employee dispute. After all, I am certainly not a "member;" there is no mention of the word "employee;" and no other phrase under which I can be classified other than as a customer.

[3] If the Office of Arbitration were to rule that I am not a customer making an industry claim, as set forth by the aforementioned rule, it must nevertheless acknowledge that all references to 'customer,' such as Rule 600 or Rule 607, also use the reference to 'non-member.' I certainly must be a non-member, for there is no other definition to cover an employee dispute. Equally clearly, any rule which does not jointly reference 'customer' with 'non-member' uses the phrase 'public customer' instead.

[4] In my letter to Mr. Kreuter in August 2004, I argued that the NYSE rule in favor of my taking the arbitration to the AAA, since the NYSE Rules are oddly silent about 'employees' and that Rule 600(f) requires that any employee dispute cannot be considered by the NYSE unless the agreement to arbitrate was signed after the dispute began. That was not the case. I also focused your attention to the fact that the scope of NYSE arbitration is limited to customers, investors and others with similar business relationships, that my dispute does not arise out of a business of Goldman Sachs and that the NYSE rules cover third-party and external disputes. Given that the NYSE ruled against me, it is incumbent upon the NYSE to ensure that its rules be read to apply to employee disputes. That is the minimum standard of fairness. Having accepted my arbitration in the face of my warnings about the silence of NYSE Rules on employee matters, the Office of Arbitration should exercise its considerable discretion in my favor. In any event I am a customer, even if one making an industry claim.

[5] It is well know that Rule 627(f) was created to provide for public access to arbitration decisions but while protecting the privacy of the individual. I am an individual no doubt, and the confidentiality provisions of the Uniform Code of Arbitration (UCA) were written to protect me. Rule 630 is a catchall rule designed to ensure that the UCA is fully available to me. I brought this arbitration under the protection of that promise of confidentiality.

EXHIBIT C:   AWARD, DATED MARCH 9, 2006, DATED JANUARY 20, 2006,

DATED DECEMBER 7, 2005



New York Stock Exchange. Inc.
20 Broad Street
New York, NY 10005

Tel: (212) 656-6468
Fax: (212) 656-2727
dlcarey@nyse.com

David L. Carey
*Chief Arbitration Counsel*

**NYSE**

March 9, 2006

RE:    Sandeep Dalal v. Kevin Whitney and Goldman Sachs & Co.
        NYSE Docket #2004-015821

TO THE PARTIES:                          TO THE ARBITRATORS:

Sandeep Dalal                            Dennis McLeavey Jr.
The Observatory of Georgetown            Charlottesville, VA 22903-0668
2111 Wisconsin Avenue, NW                Member, Non-Securities Panel
Washington, DC 20007
Claimant Representative                  Morris Levin, Esq.
                                         Washington, DC 20036
                                         Member, Non-Securities Panel
Robin Fessel, Esq.
Sullivan & Cromwell LLP
125 Broad Street                         Stephanie Malevich
New York, NY 10004                       Falls Church, VA 22046-3505
Respondent Representative                Member, Securities Panel


Ladies and Gentlemen:

Please be advised that the panel of arbitrators has reviewed the Claimant's Request for
Modification of Award dated February 8, 2006 and the Respondent's Response dated February
22, 2006.

The arbitrators have denied the request for a modification of the award.


Sincerely,

David L. Carey
:ab

David L. Carey

New York Stock Exchange, Inc.
20 Broad Street
New York, NY 10005

Tel: (212) 656-6468
Fax: (212) 656-2727
dlcarey@nyse.com

# ◼ NYSE

January 20, 2006

RE:    Sandeep Dalal v. Kevin Whitney and Goldman Sachs & Co.
       NYSE Docket #2004-015821

TO THE PARTIES:
Robin Fessel Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Respondent Representative

Sandeep Dalal
The Observatory of Georgetown
2111 Wisconsin Avenue, NW
Washington, DC 20007
Claimant Representative

Attached is the award in the above matter with the revised Remarks section.

Sincerely,

David L. Carey

:ws

Enclosure

# NYSE

New York Stock Exchange
In the Matter of Arbitration Between

---

**Case:** Sandeep Dalal v. Kevin Whitney and Goldman Sachs & Co.
**Docket Number:** 2004-015821

---

**Attorneys:**

**For Claimant(s):**
Sandeep Dalal - Washington, DC

**For Respondent(s):**
Robin D. Fessel - New York, NY

---

**Date Filed:** 11/3/2004                    **First Scheduled:** 06/28/2005
                                             **Decided:**        11/25/2005

---

**Case Summary:** Non-member, claimant, alleges a breach of contract claim for $238,000 based on the cancellation of his employer firm's Restricted Stock Units, and a claim for $375,000 based on quantum meruit for failure to pay a bonus in 1999, and seeks punitive damages based on breach of the covenant of good faith and fair dealing.

---

**Product:**                                 **Market:**

---

**Claim Data:**                              **Award Data:**
  Claim:       $613,000.00                     Award:      $25,000.00
  Punitive:    UNSPECIFIED                      Punitive:       $0.00
  Atty Fees:   UNSPECIFIED                      Atty Fees:      $0.00
  Deposit:       $1,000.00                      Costs:          $0.00
Forum Fees: $6,900.00

**Case:** Sandeep Dalal v. Kevin Whitney and Goldman Sachs & Co.
**Docket Number:** 2004-015821

---

**Decision:** The undersigned arbitrator(s) have decided and determined that in full and final settlement of all claims between the parties that:

The Statement of Claim against Kevin Whitney is dismissed.  Respondent Goldman Sachs & Co., Inc. shall pay to Claimant Sandeep Dalal $25,000.00 as an award on the Statement of Claim.  NYSE forum fees of $6,900.00 are assessed against the parties equally.

---

**Remarks:** Pursuant to the parties' agreement and the arbitrators' approval, the name of the claimant will not appear on the publicly available version of the award.

---

The undersigned arbitrators hereby affirm that they have executed this instrument which is their award:

**Arbitrators:** (D = Dissents)        **Signatures:**
  Dennis W. McLeavey
  Morris J. Levin
  Stephanie Jean Malevich

**City, State:** Washington, DC        **Date:** 11/25/2005

---

**Sessions:** 6
**Hearing Dates:**
  11/01/2005, (1)
  11/02/2005, (2)
  11/03/2005, (2)
  11/04/2005, (1)

ARB JAN 20, 2006 PM 2:15:59


# NYSE
New York Stock Exchange
In the Matter of Arbitration Between

**Case:** Sandeep Dalal v. Kevin Whitney and Goldman Sachs & Co.
**Docket Number:** 2004-015821

**Attorneys:**

**For Claimant(s):**
  Sandeep Dalal - Washington, DC

**For Respondent(s):**
  Robin D. Fessel - New York, NY

**Date Filed:** 11/3/2004

**First Scheduled:** 06/28/2005
**Decided:** 11/25/05

**Case Summary:** Non-member, claimant, alleges a breach of contract claim for $238,000 based on the cancellation of his employer firm's Restricted Stock Units, and a claim for $375,000 based on quantum meruit for failure to pay a bonus in 1999, and seeks punitive damages based on breach of the covenant of good faith and fair dealing.

**Product:**

**Market:**

**Claim Data:**
  Claim:      $613,000.00
  Punitive:   UNSPECIFIED
  Atty Fees:  UNSPECIFIED
  Deposit:    $1,000.00
Forum Fees: $6,900.00

**Award Data:**
  Award:      $25,000.00
  Punitive:   $0.00
  Atty Fees:  $0.00
  Costs:      $0.00

**Case:** Sandeep Dalal v. Kevin Whitney and Goldman Sachs & Co.
**Docket Number:** 2004-015821

**Decision:** The undersigned arbitrator(s) have decided and determined that in full and final settlement of all claims between the parties that:

The Statement of Claim against Kevin Whitney is dismissed.  Respondent Goldman Sachs & Co., Inc. shall pay to Claimant Sandeep Dalal $25,000.00 as an award on the Statement of Claim.  NYSE forum fees of $6,900.00 are assessed against the parties equally.

**Remarks:**

The undersigned arbitrators hereby affirm that they have executed this instrument which is their award:

**Arbitrators:** (D = Dissents)      **Signatures:**
  Dennis W. McLeavey
  Morris J. Levin
  Stephanie Jean Malevich

**City, State:** Washington, DC       **Date:**        11/25/05

**Sessions:** 6
**Hearing Dates:**
  11/01/2005, (1)
  11/02/2005, (2)
  11/03/2005, (2)
  11/04/2005, (1)

ARB NOV28,2005 PM12:23:53

EXHIBIT D:  NYSE USER GUIDE PAGE 8, 17



# NYSE

# Users Guide
# To Arbitration

### The New York Stock Exchange



8 | New York Stock Exchange

## The Rules and Flexibility of the Process

Arbitration, historically a creation of contract, is an agreement by the parties to resolve their disputes outside of the traditional courtroom. Accordingly, parties are free to agree on how this process will work; they may decide what rules will apply, who the arbitrators will be and how they are selected.

Too often, it appears that parties are unaware of the flexibility of the NYSE arbitration process. For example, with the assistance of Arbitration Counsel, the parties may agree to shorten or lengthen deadlines, submit briefs, set mutually convenient dates for the completion of discovery and the hearing, arrange for mediation, select a hearing situs, alter the method by which arbitrators are appointed, specify certain characteristics they would like in the panel of arbitrators, and arrange to have arbitrators issue a reasoned decision rather the traditional type of arbitration award. 

In order to benefit from the flexibility of the rules and assistance available from Arbitration Counsel, the parties must first be willing to cooperate with each other. It is mutually beneficial and in their best interest to do so.

In some instances, a party may feel it necessary or desirable to have the arbitrators explain their reasoning. If both parties agree and request a more detailed decision, and advise Arbitration Counsel in advance of the arbitrators' appointment, the arbitrators selected will be advised that a reasoned decision is required. Without advance notice, it is strictly within the arbitrators' discretion whether or not to issue a reasoned decision. 

## Payment of Awards

Arbitration awards must be paid within 30 days of receipt, unless a motion to vacate the award has been filed in court. An arbitration award shall bear interest from the date of the award: (i) if not paid within 30 days of receipt; (ii) if the award is the subject of a motion to vacate which is denied; or (iii) as specified by the arbitrators.

Generally NYSE arbitration awards are promptly paid with no further action required. However, if after 30 days you have not received payment of an award, there are several steps you can take. The first thing you should do is contact the NYSE Arbitration Counsel. The Arbitration Counsel will contact the responsible party to inquire why the award has not been paid. It has been our experience in a few instances that payment has been briefly delayed in processing or in transmittal. Under the Rules of the NYSE, a member who fails to honor an arbitration award is subject to disciplinary action.

Arbitration awards are also enforceable under federal and state laws. To enforce an arbitration award in court, a party must file a motion to confirm. Once an arbitration award is confirmed by a court, it becomes a court judgement that can be enforced like any other judgement.

EXHIBIT E:   ORIGINAL STATEMENT OF CLAIM

STATEMENT OF CLAIM

Claimant: Sandeep Dalal
The Observatory of Georgetown, Apt. 208
2111 Wisconsin Avenue, NW
Washington, DC 20007

Respondent: Goldman Sachs & Co.
85 Broad Street
New York, NY 10004

Date: October 11, 2004

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## INTRODUCTION

In April 1999, Goldman Sachs & Co. ("Goldman Sachs") awarded Mr. Sandeep Dalal ("Dalal") 2,123 Formula Restricted Stock Units, doing so in recognition of *past* services to all employees in anticipation of the initial public offering of the company's stock (the "IPO Award"). The company completed its initial public offering on the New York Stock Exchange on May 4, 1999. Dalal's employment with Goldman Sachs ended on August 27, 1999, at which time Dalal accepted employment as Vice President of Core Capital Partners, a Small Business Investment Company (SBIC) located in Washington, DC. In May 2000, Dalal accepted a new job, as President of India.com, an information technology and dotcom business based out of the United States and India.

Goldman Sachs preliminarily wrote to Dalal on June 5, 2000, informing him that the IPO Award had been terminated. After exchanges of letters, in accordance with the process required by the IPO Award, Goldman Sachs confirmed via a letter dated January 23, 2002 that the prior decision was to remain unchanged. The sole basis for termination of the IPO Award in Goldman Sachs' letters was the claim that Dalal had "engaged in competitive activity,"[1] applying specific provisions of Section 4(b)(ii) of the terms and conditions which govern the IPO Award.

Dalal disagrees, and respectfully submits this brief for arbitration in opposition to Goldman Sachs' erroneous conclusion. In support of his position, Dalal respectfully submits the following facts for arbitration and remedy. Per NYSE Arbitration Rules, he requests a reasoned, written decision from the honorable Arbitrators. Per the terms and conditions of the contract, Dalal requests confidentiality. Confidentiality must cover materials related to the arbitration, including but not limited to documents submitted by him and Goldman Sachs, arguments made by both sides and names and addresses of parties.

## SUMMARY OF DALAL'S ARGUMENTS

**Goldman Sachs granted Dalal the IPO Award in recognition for services performed by him in the *past*. Top management additionally assured Dalal that he would be able to retain his IPO Award. Dalal was an employee of the company at the time of the IPO Award, remaining so well past the date of the initial public offering. With the passage of time, as the company's high profile IPO was in the past, as political strife within the organization subsided, as the public relations risk of employee disputes receded and as the value of Dalal's goodwill declined, Goldman Sachs reneged on its commitment. It then**

---

[1] Goldman Sachs letter to Dalal dated June 5, 2000 referenced "Termination of IPO Award," included as Exhibit E.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

terminated the IPO Award, doing so without regard to specific facts (which evidence that Dalal's subsequent employers were not a "Competitive Enterprise"[9]); without basis in written terms and conditions (which place three incremental hurdles that were unmet); without regard to oral contracts (which promised Dalal that he would be permitted to retain the IPO Award even if he were to join a competitor); without regard to written assurances (which preamble the IPO Award as vested stock for *past* services, not future commitments); without regard to conflicts among contradictory provisions of the contract (which further belie Goldman Sachs' conclusion); without regard to the fact that the *de facto* non-compete agreement violates New York law; without commitment to the covenant of good faith and fair dealing implicit in all contracting; and without regard to a quantum meruit claim for work performed in fiscal year 1999 (which arises upon termination of the IPO Award).

*Argument I:*

Goldman Sachs Erroneously Applied Definition of "Competitive Enterprise."[9]

*Argument II:*

Goldman Sachs Erroneously Applied Cited Provision Section 4(b)(ii).

*Argument III:*

Goldman Sachs Breached Oral Contracts.

*Argument IV:*

Goldman Sachs Breached Written Assurances.

*Argument V:*

Goldman Sachs' Contractual Provisions Are Contradictory.

*Argument VI:*

Goldman Sachs' Termination Of IPO Award Violates New York Law As Applicable To Forfeiture-For-Competition Agreements.

*Argument VII:*

Goldman Sachs Breached Covenant Of Good Faith And Fair Dealing.

*Argument VIII:*

Goldman Sachs' Actions Created A Quantum Meruit Claim.

The above arguments are not set forth as legal theories. Nevertheless they rely on legal theories of breach of written and oral contracts, contracts upon which Dalal relied when giving up compensation due and earned in 1999, and of promissory estoppel, assurances and promises by Goldman Sachs upon which Dalal relied. As a result of Goldman Sachs' failure to abide by its contracts, its false promises and its false representations, and Dalal's reasonable reliance upon them, Dalal stands damaged. Additional legal theories cover a claim brought forth under covenant of good faith and fair dealing and a claim brought forth as a quantum meruit claim.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## GOVERNING DOCUMENTS

Dalal's IPO Award was made pursuant to a booklet titled the *IPO Award Summary*, included here as Exhibit A. The IPO Award included an *IPO Award Statement For: Sandeep Dalal*, included here as Exhibit B. Further, the IPO Award is governed by terms and conditions set forth in writing in a booklet titled the *1999 Formula RSU Award Agreement* (the "Agreement"), included here as Exhibit C.

In addition to the aforementioned documents, relevant materials also include (1) a Goldman Sachs letter dated April 1999 (no day provided) to all employees from the top management of Goldman Sachs, included here as Exhibit D, (2) a Goldman Sachs letter to Dalal dated June 5, 2000 referenced "Termination of IPO Award," included here as Exhibit E, (3) Dalal's letter to Goldman Sachs dated October 16, 2000, included here as Exhibit F, (4) a Goldman Sachs letter to Dalal dated December 15, 2000, included here as Exhibit G, (5) a Goldman Sachs letter to Dalal dated April 26, 2001, included here as Exhibit H, (6) Dalal's letter to Goldman Sachs dated October 28, 2001, included here as Exhibit I, (7) Dalal's letter to two Partners of Goldman Sachs dated October 28, 2001, included here as Exhibit J, and (8) a Goldman Sachs letter to Dalal dated January 23, 2002, included here as Exhibit K.

Other documents governing the IPO Award are (1) The Goldman Sachs 1999 Stock Incentive Plan, (2) part of a prospectus of The Goldman Sachs Group, Inc. titled The Goldman Sachs 1999 Stock Incentive Program, (3) the booklet titled *Formula Restricted Stock Units: June 2000 Delivery*, (4) the Custody Agreement between Goldman Sachs and Chase Manhattan, (5) Goldman Sachs IPO Award — Instruction Guide, (5) a November 1999 letter containing procedures for former employees and (6) the Former Employee Information Form. These six documents are not included here since each is silent on the terms and conditions governing the IPO Award and lack pertinence to the issues at hand.

## CHOICE OF FORUM AND LAW

The IPO Award is governed by written contract among the parties. Section 15 of that Agreement calls for any dispute, controversy or claim to be settled by arbitration in New York City by the New York Stock Exchange, and if the matter is declined by the New York Stock Exchange, by the American Arbitration Association in accordance with its commercial arbitration rules. Section 16 of the Agreement subjects the IPO Award to laws of the state of New York. Dalal respectfully submits the matter to the New York Stock Exchange for arbitration.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## TIMELINESS

The IPO Award is governed by written contract among the parties and governed by New York's statute of limitations. Pursuant to contractual requirements, reconsideration of Goldman Sachs' termination was required to first be sought with Goldman Sachs prior to the initiation of any arbitration proceeding. Goldman Sachs declined to reconsider its decision, complemented Dalal for compliance with "requirement set forth in Paragraph 15(a)" and green lighted an arbitration filing via a letter dated January 23, 2002.[2] The statute of limitations on the contract runs from the date of that letter. Dalal respectfully submits that his request for arbitration is timely and in accordance with provisions of New York law, as well as Rule 603 of the NYSE Arbitration Rules.

## RELEVANT FACTS

### Summary Of Dalal's Background

Dalal is a permanent resident of the United States Of America and a citizen of the Republic Of India.

Dalal joined Goldman Sachs in August 1996 as an Associate in the Leveraged Finance Group, pursuant to a written offer letter. At the time, Dalal had already completed an master's degree in business administration from Harvard Business School in 1996 and a master's degree (specializing in international banking and finance) from Columbia University's School Of International & Public Affairs in 1991. Dalal had also completed a bachelor's degree in economics (honors) from St. Stephen's College at the University of Delhi in India. He had also worked for three years as an Investment Banking Analyst at Lehman Brothers, where he was ranked at the top of his class and given an offer to stay on as an Associate. At the time of his joining Goldman Sachs, Dalal had also worked summer jobs with Bain & Company in London in 1995, which gave him an offer to become an associate, and with Credit Suisse's Treasury Group in 1991.

### Review Of IPO Award And Termination

Consistent with NYSE Rule 612(a), Dalal wishes to present the following relevant facts in support of his case.

On April 8, 1999, as part of a company-wide award of stock ownership to all employees at the time of the company's initial public offering of stock, Dalal's

---

[2] Goldman Sachs letter to Dalal dated January 23, 2002, included here as Exhibit K.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

supervisors John Townsend (Partner & Managing Director) ("Townsend") and Adrian Kingshott (Managing Director) ("Kingshott") informed him generically of an award, in anticipation of an oncoming initial public offering. As explained to Dalal, the equity awards were of two kinds, one for prior service (constituting 100% of Dalal's IPO Award) and the other an incentive for future employment. Among other details, Dalal was informed that his IPO Award was not contingent on future service. He was also told that he would receive no incentive stock option for future service at the firm.[3]

Weeks later, Goldman Sachs executed an initial public offering of its shares on the New York Stock Exchange. Townsend and Kingshott specified the details of the IPO Award to Dalal, informing him in person of the numerical amount of the IPO Award, included here as Exhibit B. At the time, they summarized the key terms and conditions of the IPO Award, including reiterating, among other things, that Dalal's IPO Award was not contingent on future service.

At the time of those conversations, Dalal's work was distinguished by its quality. He had been assigned to virtually all the revenue generating transactions executed by the leveraged finance group in which he was an associate. Although there were approximately seventy professionals within the group, twenty-five to thirty of whom were associates like Dalal, he was chosen to be the associate on seven out of nine revenue generating transactions in the months up to the IPO Award. Dalal did the bulk of the execution work on millions of dollars worth of fees in the last twelve months of his tenure at Goldman Sachs, more than all the other associates in his group combined. Not only was he bearing the disproportionate burden of executing revenue-generating projects in the group but he was also preferred by clients to be the point person in their conversations with Goldman Sachs.

Also indicative of Dalal's reputation at the time of the IPO Award was the remarkable statistic in his last annual review in November 1998, which indicated that approximately fourteen bankers at Goldman Sachs considered his work 'exceeded' the standards of a banker. Interestingly, that number was higher than the total number of reviewers submitted by his peers (who asked for an average of twelve reviews, ranging from six to fourteen reviews). Clearly then, any honest reading of those reviews suggested that he was among the top ranked associates in his class. This context of honest hard work is central to the fairness of Dalal's arguments. It not only evidences that equities are in favor of Dalal but buttresses contractual arguments, the quantum meruit claim and punitive damage claim set forth later.

---

[3] Dalal was also told that he would be permitted to keep his IPO Award when he left Goldman Sachs, an arrangement he believed was entered into with everyone who was not given a retention award.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Goldman Sachs completed its initial public offering on May 4, 1999, doing so at a price of $75 per share. The underlying value of Dalal's IPO Award is set forth later in this brief. The detailed terms and conditions were later provided to Dalal in writing in two booklets, the IPO Award Summary (included here as Exhibit A) and the Agreement (included here as Exhibit C). The IPO Award was deliverable in three equal installments, on each of the first, second and third anniversary of the initial public offering. Specifically, 707 shares were deliverable on the first anniversary of the IPO, 708 shares were deliverable on the second anniversary of the IPO and 708 shares were deliverable on the third anniversary of the IPO. Dalal remained an employee of Goldman Sachs through August 27, 1999, well past the IPO date.

Dalal's choice of subsequent employment included both investment banks and a Small Business Investment Corporation named Core Capital Partners. Prior to finalizing Dalal's employment choices, he met with Townsend and Kingshott on occasion, partly out a desire to confirm the retention of his IPO Award. He also met frequently with Linda Fox and Andrew Walker, vice presidents in the human resources department of Goldman Sachs. Townsend and Kingshott told Dalal that retention of his kind of award was not an issue. They committed to permitting Dalal to retain his IPO Award when he left Goldman Sachs, even if he accepted employment with an investment bank, *even if* that investment bank was a clear competitor in the area in which he had worked at Goldman Sachs.[4] By inference, Dalal's employment with Core Capital Partners must be understood to even more clearly conform to Goldman Sachs' preferences and desires, since a Small Business Investment Company is in a different line of business than the one he (or anyone) was engaged in at Goldman Sachs, and less a competitor than banks with which Townsend was comfortable.

Given that the assurance had first been made in April 1999, when Townsend had acted as a partner of Goldman Sachs, then still a private partnership, and confirmed later when Townsend had acted as Managing Director and Member of Commitments Committee, pursuant to firm wide responsibilities of Goldman Sachs (now a public corporation), Dalal was rest assured. Based on those assurances, Dalal sought no compensation from Core Capital Partners for the contingent loss of the IPO Award. Goldman Sachs unreasonable change of heart thus denied Dalal an opportunity to obtain make-whole compensation from Core Capital Partners, or from another employer, or alternatively join an employer that would not have triggered a termination of the IPO Award.

---

[4] Dalal will seek to confirm those conversations through deposition of several current and past employees of Goldman Sachs.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

*Rationale For IPO Award*

The IPO Award was made for *past services* performed as an employee of Goldman Sachs, not for future services or for continued employment after the IPO date. That was clearly established on page three of the IPO Award Summary (included as Exhibit A).

> In general, your Formula RSU Award was determined based on your compensation and years of service with the firm.[5]

The above language is clear. This point is relevant both in the context of the argument that segments of the IPO Award contradict each other as well as the covenant of good faith and fair dealing, which suggests that the IPO Award should be construed to be exactly what it is labeled.

Further, page three of the IPO Award Summary goes onto to clarify that the 2,123 shares were fully vested on the IPO date.

> The Formula RSUs are "vested" in the sense that you do not need to remain employed by the Firm in order to receive the underlying Common Stock...[6]

Section 11 of the Agreement further clarifies the past due nature of the IPO Award, where it specifically states that the IPO Award cannot be construed as giving Dalal:

> ...any right to continued Employment by the Firm or affect any right which the Firm may have to terminate or alter the terms and conditions of your Employment.[7]

Neither the staggered delivery schedule of the IPO Award nor Goldman Sachs' subsequent desire to deny Dalal his stock can detract from the indisputable fact that the economic value being arbitrated constituted a right already duly *earned* and a compensation *past due*. The point becomes important to a later argument, where Dalal argues that the termination of the IPO Award turns it into a non-compete agreement. If Goldman Sachs believes that the terms of the IPO Award permit it to seek 'forfeiture-for-competition,' it must then adhere to both the 'reasonableness doctrine' and the 'employee choice doctrine' under New York law, which then become applicable, and which then preclude Goldman Sachs' decision.

---

[5] The IPO Award Summary, included here as Exhibit A.
[6] The IPO Award Summary, included here as Exhibit A.
[7] The IPO Award Summary, included here as Exhibit A.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

*Termination Of IPO Award*

On June 5, 2000, Goldman Sachs informed Dalal via letter titled "Termination of IPO Award" (included here as Exhibit E) that Dalal's IPO Award had been terminated and no shares or cash were deliverable with respect to Dalal's IPO Award. Goldman Sachs provided only one reason for the termination of the IPO Award, stating:

> ...you have engaged in the competitive activity described in Paragraph 4(b)(ii) of your RSU Agreement. Accordingly, all of your rights in respect of your 2,123 Formula RSUs terminated as of June 2, 2000, and no shares will be delivered in respect of those RSUs.[8]

*Subsequent Communication Among The Parties*

In accordance with the process outlined in the termination letter, Dalal submitted to Goldman Sachs, via a letter dated October 16, 2000, details of his disagreement with the termination of the IPO Award (included here as Exhibit F). Dalal was required to do so per Section 15(a) of the agreement, which mandated Dalal to apply to Goldman Sachs for reconsideration prior to any arbitration. Goldman Sachs acknowledged receipt of Dalal's response via a letter dated December 15, 2000, informing Dalal of a final decision by April 2001 (included here as Exhibit G). On April 26, 2001, Goldman Sachs affirmed termination of Dalal's IPO Award (included here as Exhibit H), which letter cited the same, sole reason for termination.

> ...we have determined that you did not meet the condition for delivery contained in Paragraph 4(b)(ii) of your RSU Agreement.[9]

Dalal responded once again via a letter dated October 28, 2001 (included here as Exhibit I) but which elicited no change of position by Goldman Sachs. Dalal also wrote to Townsend and Robert Kaplan, the former being the officer who made the verbal assurances on behalf of Goldman Sachs (included here as Exhibit J). Yet Goldman Sachs informed Dalal via a letter dated January 23, 2002 (included here as Exhibit K) that its decision was unchanged, that Dalal had met the requirement of Section 15(a) of the Agreement, which required that Dalal's claims first be submitted to Goldman Sachs for consideration, prior to initiation of arbitration. Thus the stage was set for the current arbitration.

---

[8] Goldman Sachs letter to Dalal dated June 5, 2000 referenced "Termination of IPO Award," included here as Exhibit E.

[9] Goldman Sachs letter to Dalal dated April 26, 2001, included here as Exhibit H.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

*Necessary And Sufficient Conditions Under Section 4(b)(ii)*

Since part of the disagreement among the parties may be distilled into the parties' differing understandings of Section 4(b)(ii) of the agreement, it is pertinent to discuss it in detail. Only the full section is extracted as a footnote here, with the full agreement available as Exhibit A.[10]

The contractual language makes clear that Goldman Sachs must conclude that Dalal worked for a "Competitive Enterprise" (please turn to footnote). But proving that Dalal was employed by a Competitive Enterprise is merely the first step, a necessary condition, so to speak, for establishing Goldman Sachs' right to termination.

The second step requires Dalal's employment with a presumed Competitive Enterprise to incrementally have at least one of three characteristics. First, the work must be "similar or substantially related" to the work performed by Dalal in the last twelve months of his tenure at Goldman Sachs. Second, the work must be one for which Dalal had "supervisory responsibility" in the last twelve months of his tenure at Goldman Sachs. Third, the work must require the "same or specialized skills" as those used by Dalal in the last twelve months of his tenure at Goldman Sachs.

---

[10] Per the Glossary of Terms included at the end of the Agreement, a "Competitive Enterprise" as referred to in Section 4(b)(ii) of the Agreement:

> means a business enterprise that (i) engages in any activity, or (ii) owns or controls a significant interest in any entity that engages in any activity, that, in either case, competes anywhere with any activity in which the Firm is engaged. The activities covered by the previous sentence include, without limitation, financial services such as investment banking, public or private finance, lending, financial advisory services, private investing (for anyone other than you and members of your family), merchant banking, asset or hedge fund management, insurance or reinsurance underwriting or brokerage, property management, or securities, futures, commodities, energy, derivatives or currency brokerage, sales, lending, custody, clearance, settlement or trading.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

**To summarize the section cited by Goldman Sachs, the concept of Competitive Enterprise is clearly limited by contextual and time constraints and cannot be read piecemeal or read selectively (please turn to footnote).[11] Proving that Dalal's employers were a Competitive Enterprise is a necessary condition for establishing termination but not a sufficient condition, for which Goldman Sachs must fulfill three additional contractual hurdles set within the same section, all of which remain beyond its grasp in the current context.**

*Note On Rest Of Section 4(b)(ii)*

Goldman Sachs' contention clearly ignores both the necessary and sufficient conditions just cited. Presumably, for the sake of argument only, Goldman Sachs is relying on the language at the end of Section 4(b)(ii), which lists examples of prohibited activity, listed as "[b]y way of example only" (please turn to footnote). First and foremost, none of the examples apply to Dalal, who was not an advisory banker, and certainly did not join a leveraged buyout fund. Second, even if Goldman Sachs believes that it is permitted to terminate the IPO Award

---

[11] Section 4(b) of the agreement states that Dalal's IPO Award would terminate if:

You will have engaged in conduct specified in this Paragraph 4(b) if, as determined by the Committee, at any time prior to the relevant Delivery Date:

...

(ii)    in the event you are categorized by the Firm as an exempt employee (or the equivalent outside the United States) on the relevant Delivery Date or were so characterized on the date of termination of your Employment, you (A) form, or acquire a 5% or greater equity ownership, voting or profit participation interest in, any Competitive Enterprise, or (B) associate (including, but not limited to, association as an officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise and in connection with such association engage in, or directly or indirectly manage or supervise personnel engaged in, any activity (1) which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Firm, (2) for which you had direct or indirect managerial or supervisory responsibility at the Firm or (3) which calls for the application of the same or similar specialized knowledge or skills as those utilized by you in your activities with the Firm, at any time during the one-year period immediately prior to termination of your Employment (or, in the case of an action taken prior to termination of your Employment, during the one-year period immediately prior to such action), and in any such case, irrespective of the purpose of the activity or whether the activity is or was in furtherance of advisory, agency, proprietary or fiduciary business of either the Firm or the Competitive Enterprise. (By way of example only, this provision would preclude an "advisory" investment banker from joining a leveraged-buyout firm, a research analyst from becoming a proprietary trader or joining a hedge fund, or an information systems professional from joining a management or other consulting firm and providing information technology consulting services or advice to any Competitive Enterprise.); or

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

on the basis of the examples cited, it cannot contend that the throwaway language at the end of the section can be allowed to contradict the contractual language of Section 4(b)(ii). Any information cited "[b]y way of example only" is exactly that, no more, examples that merely illuminate Goldman Sachs' intent as drafter of the terms and conditions. But even that intent is interesting if and only if the examples do not overwhelm the contractual language. But they do overwhelm the contractual language, so Dalal respectfully submits that Goldman Sachs cannot rely on those "examples only" for they so clearly contravene clear contractual language.

Presumably, once again for the sake of argument only, Dalal believes that Goldman Sachs included the throwaway language so that it superficially fulfills the 'reasonableness doctrine' of non-compete clauses under New York law without actually doing so in fact, thus enabling the company to have its cake and eat it too. Instead, Dalal contends that both the plain-English meaning and well-established principles of contract construction suggest that the "examples only" must fade away in favor of the necessary and sufficient conditions just summarized.

## DETAIL OF ARGUMENTS

*Argument I:*
*Goldman Sachs Erroneously Applied Definition Of "Competitive Enterprise"*

Summary Of Argument I

Firstly, neither Core Capital Partners nor India.com, Dalal's subsequent employers, constitute a "Competitive Enterprise," as defined in the IPO Award documents.[12] As detailed in this brief, Dalal's work at a Small Business Investment Company such as Core Capital Partners was completely unrelated to work performed by him in the last twelve months of his tenure at Goldman Sachs, as an underwriter of high yield bonds and leveraged loans. As also detailed here, Dalal's subsequent appointment as President of India.com was even more unrelated to his work at Goldman Sachs, being a management position in the Internet services industry, with no business in *any* aspect of finance. Indeed, neither India.com nor Core Capital Partners

> (i) engages in any activity, or (ii) owns or controls a significant interest in any entity that engages in any activity, that, in either case, competes anywhere with any activity in which the Firm is engaged[13]

---

[12] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.
[13] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

In other words, *Dalal's IPO Award was terminated pursuant to a definition of Competitive Enterprise that is clearly unavailing.*

Type Of Work Done At Goldman Sachs

Dalal's work at Goldman Sachs between August 1998 and August 1999 (the last twelve months of his tenure) was specific and focused to the area of high yield debt issuances and leveraged lending, for large companies, with significant amounts of debt, and hence ones with stable revenues and significant free cash flows. Goldman Sachs is among the biggest of the big investment banks and, in Dalal's field of leveraged finance, acted as an *agent* in its transactions, raising capital for others in amounts no less than $100 million at a time, and preferably in greater amounts. While Dalal's work at Goldman Sachs related to the arcane world of large debt financings in its role as an *agent* and *underwriter*, Dalal's subsequent work was in venture capital as a *principal* and *investor*, even interacting with companies so small as to be unqualified and unsuitable for debt, the business he was engaged in at Goldman Sachs.

Further, Goldman Sachs is neither a Small Business Investment Company, subject to investment criteria statutorily set by the US Small Business Administration (as is Core Capital) nor a dotcom (as is India.com). In the first context, Goldman Sachs cannot engage in the business of a Small Business Investment Company, without registering with the Small Business Administration, which it has not done. Even if it were to do so, those requirements are onerous, requiring Goldman Sachs' $5 billion+ fund to invest in "small companies" only, with less than $18 million in net worth and $6 million in net income, thus precluding a private equity player of its size from being a competitor to small business investment companies. With regard to the second context, Goldman Sachs cannot be considered a provider of free email, news, chat and other dotcom services, without violating common sense.

Core Capital Partners Was Not A Competitive Enterprise

Core Capital is not a multi-billion "venture capital" fund that competes with the likes of Goldman Sachs. Core Capital Partners, which Dalal joined at inception as Vice President, was a $60 million fund with $100 million from the Small Business Administration. It had four professionals and two support staff in Washington, DC. The fund focuses on information technology, and technology-impacted companies, the communications industry and the business services sector.

Core Capital Partners was an investor in the smallest-of-small-capitalization companies in the early stages of growth, principally in technology and technology-impacted businesses. Core Capital Partners acted as *principal* in all its

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

transactions, investing capital for itself in amounts no more than $1-2 million at a time. Dalal's work at Core Capital Partners was specific and focused to the area of venture capital, for small companies rather than large companies, companies in technology and other high growth sectors versus non-technology and slow growth sectors, companies with no debt rather than significant amounts of debt, companies that were unprofitable and often without revenues rather than stable revenues and high free cash flows, companies focused in the mid-Atlantic states rather than globally, companies that could have one day become clients of Goldman Sachs were they to grow enormously.

Further, all investments made while Dalal was at Core Capital Partners were made under the regulations of the Small Business Administration, which Goldman Sachs is not qualified to make. So Core Capital Partners cannot be a Competitive Enterprise as defined in the Agreement. In fact the equity of Core Capital Partners fund is equal to many single investments by Goldman Sachs. Even worse, the total equity of $60 million of Core Capital is certainly less than the net worth of many a partner of Goldman Sachs, even those who are involved in this matter. Section 4(b)(ii) of the Agreement is thus unavailing.

India.com Was Not A Competitive Enterprise

In May 2000, Dalal joined India.com, Inc. as President, a startup information technology services and dotcom company with 200 employees in the United States and India. Dalal's work as President of India.com was specific and focused to dotcom and information technology services for individuals and businesses, a company that could have one day become a client of Goldman Sachs, were it to have grown enormously.

At the time Goldman Sachs terminated Dalal's IPO Award, Dalal was President of India.com, a New Jersey company that sought to become the leading supplier of dotcom services and information technology products and services in India. The Company's core business strategy was to leverage the power of the Internet to bring Indian businesses online. In addition, India.com launched a comprehensive portal in 2000, focused on compelling content and commerce functionalities for the Indian Diaspora.

Neither dotcom services for the Indian Diaspora nor information technology products for India are businesses in which Goldman Sachs has ever been engaged at any time. India.com too cannot be a Competitive Enterprise. The necessary condition for Section 4(b)(ii) of the Agreement is thus absent and makes the whole clause unavailing.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Cooperative, Not Competitive Relationship

Dalal's relationship with Goldman Sachs after August 1999 was cordial, interactive and non-competitive. Generally speaking, not only were Core Capital and India.com not competitive with any business of Goldman Sachs but both were organizations from which Dalal referred ideas and advice to Goldman Sachs. Within months of communicating with Goldman Sachs, however, Dalal realized that the threshold size of its prospective clients or portfolio investments was so big that any companies or ideas Dalal was dealing with were outside the interest and orbit of Goldman Sachs. Nevertheless Dalal's professional interactions continued and there was a general sense on both sides that both Core Capital Partners and India.com were ideal breeding ground for future business for a behemoth financial institution. Additionally, while at India.com, Dalal was introduced in 2000 to Goldman Sachs' investment banking research team in Asia to begin the process of introducing India.com to work together for an initial public offering of the company with that investment bank. Dalal was glad to pass along leads or references to Goldman Sachs' India Investment Banking team hired in 2000, which was personally known to Dalal.

It is worth summarizing a few of Dalal's interactions with Goldman Sachs. Although many communications do not survive in email form, the following did, and are clearly confirmatory of the fact that the relationship was cooperative, not competitive.

- First, whenever an investment was suitable for Goldman Sachs, Dalal approached them with that idea. One such email in 1999, to partners Joe Gleberman, Thomas Murphy and John Townsend, is included here as Exhibit L. Dalal also undertook phone and email conversations with Goldman Sachs employees in the United States, Europe and Asia with regard to investment opportunities too big for Core Capital, and which turned out to be too small for Goldman Sachs.

- Second, Dalal alerted Jan Ford, a Vice President in the Legal Department of Goldman Sachs with regard to someone falsely claiming to have worked at Goldman Sachs and in her group. Dalal would not have done so were he in a competitive context. A string of those emails in 2000 is included as Exhibit M.

- Third, Dalal routinely received investment banking research reports while at Core Capital (mainly on the technology sector) and at India.com (mainly on the Asia dotcom business). Those research reports may be provided upon request and remain retained by Dalal.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

- Fourth, Dalal approached Goldman Sachs in 2000 in connection with a prospective initial public offering of India.com. Those exchanges may be summarized upon request.

The aforementioned anecdotes should help inform any reasonable analysis that Dalal was not engaged in competitive activity; indeed, he was in a cooperative relationship.

*Argument II:*
*Goldman Sachs Erroneously Applied Cited Provision Section 4(b)(ii)[14]*

## Summary Of Argument II

Even if either Core Capital or India.com or both are hypothetically assumed to be a Competitive Enterprise (doing so here for the sake of argument only), at least one of three additional requirements had to be fulfilled as well, for the cited provision to become available to Goldman Sachs, yet not one of those hurdles was overcome:

- One, Core Capital Partners and/ or India.com must not only be a Competitive Enterprise but Dalal's work at those entities must be "similar or substantially related"[15] to the work performed in the last twelve months of his tenure at Goldman Sachs. As detailed later, this requirement was prima facie unfulfilled.

- Two, Core Capital Partners and/ or India.com must not only be a Competitive Enterprise but Dalal's work there must be of the kind for which Dalal had "supervisory responsibility"[16] in the last twelve months of Dalal's tenure at Goldman Sachs. At best (for Goldman Sachs), this requirement was unfulfilled because Dalal's subsequent work was starkly dissimilar to his prior work in the last twelve months at Goldman Sachs. At worst (for Goldman Sachs), Dalal had *no* supervisory responsibility at Goldman Sachs, suggesting that the clause was intended to target more senior employees, and inapplicable to his case.

- Third, Core Capital Partners and/ or India.com must not only be a Competitive Enterprise but Dalal's work there must call for the "same or specialized skills"[17] as those used in the last twelve months of Dalal's tenure

---

[14] The lack of employee choice makes Section 4(b)(ii) unavailable in any context, but the issue is developed later in context of de facto non-compete agreement.

[15] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.

[16] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.

[17] Booklet titled 1999 Formula RSU Award Agreement (the "Agreement"), included as Exhibit C.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

at Goldman Sachs. This third requirement was also unfulfilled, partly for reasons detailed later but mostly for the fact that it defies common sense.

All Three Hurdles Unmet With Regard To Core Capital Partners

Lets consider the three additional factors that must be present in the context of Core Capital Partners for a termination of Dalal's IPO Award, but which were not.

At Core Capital Partners, Dalal did not engage in any activity related to the US high yield debt markets, and there was thus no overlap with Dalal's work in the last twelve months of Dalal's tenure in the high yield and leveraged finance group of Goldman Sachs. Subsection (B)(1) of Section 4(b)(ii) of the Agreement was thus unavailing.

Further, Dalal did not have "any direct or indirect managerial or supervisory responsibility at the Firm," making Subsection (B)(2) of Section 4(b)(ii) of the Agreement moot and inapplicable, and certainly unfulfilled. For clarity, while at Core Capital Partners, Dalal did not "manage or supervise personnel engaged in" activities he had previously participated in while at Goldman Sachs.

Finally, Dalal's role at Core Capital Partners generally encompassed venture capital investing, which required skills specific to private equity investments. Each of those processes is distinctly different from the US high yield and leveraged lending markets. So Subsection (B)(3) of Section 4(b)(ii) of the Agreement is unfulfilled. It is an incredulous suggestion that the same skills may be required for contexts as disparate as investment banking versus venture capital; or non-technology versus technology industries; or risk aversion versus risk taking; or fee-based underwriting as an agent versus profit-based investing as a principle; or work where $75-100 million is the minimum threshold versus work where $1-2 million is the norm.

To illustrate the point further, consider many differences in skill: (a) warrants are not deminimus in the venture capital business, while they are in the high yield market, (b) stock purchase agreements are totally different from bond indentures, (c) due diligence processes for venture capital focus on upside potential, while high yield markets focus on downside protection, and so on and so forth, (d) Goldman and other investment banks acknowledge the very specific specialization that characterizes the leveraged finance field in the pattern of hiring professionals as well, (e) the deals invested in during Dalal's employment at Core Capital Partners were too small to reasonably expect Dalal to utilize knowledge of the leveraged finance world and (f) while at Goldman, Dalal's

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

activities provided him no exposure to the Internet or information technology sectors, which were the bulk of Dalal's work at Core Capital Partners.

All Three Hurdles Unmet With Regard To India.com

Even if India.com were a Competitive Enterprise, additional factors must be present for a termination of Dalal's IPO Award. Yet none of the three conditions mentioned in Section 4(b)(ii) of the Agreement were evident. At India.com, Dalal did not engage in any activity related to the US high yield debt markets and thus did not engage in any activity "which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Firm." Subsection (B)(1) of Section 4(b)(ii) of the Agreement was thus unavailing.

Further, Dalal did not have "any direct or indirect managerial or supervisory responsibility at the Firm," making Subsection (B)(2) of Section 4(b)(ii) of the Agreement inapplicable.

Finally, and even more clearly, Dalal's work as President of India.com did not call for the "application of the same or similar specialized knowledge or skills as those utilized by" Dalal as a specialist in high yield and leveraged lending. So Subsection (B)(3) of Section 4(b)(ii) of the Agreement is unfulfilled.

All in all, *the terms and conditions cited by Goldman Sachs were unavailing on account of three incremental hurdles set therein.* Even if both Arguments I & II are assumed to fail (doing so here for the sake of argument only), Goldman Sachs is estopped from applying Section 4(b)(ii).[18]

*Argument III:*
*Goldman Sachs Breached Oral Contracts*

Dalal sought and received assurances on three separate occasions from a Partner as well as a Managing Director of Goldman Sachs, who both assured Dalal that the IPO Award would not be terminated, when Dalal left the company, or even if Dalal were to join a competing investment bank.[19] Although Dalal decided not to join a competing investment bank, those oral contracts clearly preclude Goldman Sachs from applying the termination provision. Without those three oral contracts, made in three separate meetings, entered into by aforementioned two officers of the company, Dalal would certainly have sought alternative compensation that was his due, either from Goldman Sachs or from Core Capital.

---

[18] Dalal was also told that he would be permitted to keep his IPO Award when he left Goldman Sachs, an arrangement he believed was entered into with everyone who was not given a retention award.

[19] Dalal was given no incentive stock options to continue to stay on at the company.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Goldmans Sachs' promises and assurances, upon which Dalal relied, additionally denied him an opportunity to seek compensation from Goldman Sachs for his extraordinarily productive contribution to the firm in 1999 (as already alluded to).

Even if the other arguments are individually or collectively assumed to fail (assuming so only for the sake of argument here), *Goldman Sachs' breach of oral contracts thus defrauded Dalal of an opportunity to make whole his loss and denied him the benefit of his bargain.*

*Argument IV:*
*Goldman Sachs Breached Written Assurances*

If one were to grant Goldman Sachs' overly narrow reliance on the definition of a Competitive Enterprise alone, or on the throwaway language of Section 4(b)(ii), or whatever other reasoning it may choose to use, doing so violates the preamble of the IPO Award Summary, which specifically clarifies that the IPO Award is vested "in the sense that you do not need to remain employed by the Firm in order to receive the underlying Common Stock" (as quoted before).

The termination of the IPO Award thus removes the only real difference between awards given for *past* service (which constitute 100% of Dalal's award) versus awards given for *future* service (which were issued to many senior employees contingent on their continued employment but not to Dalal). It thus contradicts a common sense understanding that the IPO Award was not awarded for future service. Termination thus violated the preamble to the *IPO Award Summary* document.

More important to the argument at hand, Goldman Sachs clearly advertised and labeled Dalal's IPO Award as one for past services (an apple so to speak), not for future services (an orange so to speak). By the time the terms of the IPO Award were printed and distributed, Goldman Sachs had changed the orange, asking for the promise to not compete with it, not merely congratulating employees for past service. Even worse, by the time Goldman Sachs got around to the termination of the IPO Award, it had changed the orange further, suggesting not only no competition but no employment in any line of business in which Dalal can find employment. The termination of the IPO Award violates written assurances by top management about the IPO Award not being contingent on continued employment. Applying the analogy of apples and oranges, Goldmans Sachs violates the simple logic that if Dalal was promised an apple (an award for past services) and denied an orange (the chance to not compete with it or provide future services to it), he should receive an apple that is not an orange.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

In other words, Goldman Sachs now belatedly seeks to turn the IPO Award from being vested stock into unvested stock (which violates written assurances), or to turn it into a non-compete agreement (which violates New York law, which has twin doctrines of reasonableness and employee choice), or leave the preamble of the Agreement in contradiction with the terms of that same Agreement (which is picked up in the next argument). Above all else, it fails to distinguish between its two distinct types of awards. Instead, the contract should be constructed in a manner that gives meaning to the preamble and aforementioned provisions both, written contracts both, *to restore the only real difference between awards given for past service versus awards given for future service.*

*Argument V:*
*Goldman Sachs' Contractual Provisions Are Contradictory*

To reach Goldman Sachs' incorrect interpretation of the terms and conditions, one may presume it reads some language that is favorable to its point of view. Whether that language is throwaway language at the end of Section 4(b)(ii) or some other language in that section, Dalal respectfully submits that it contradicts the very provision it seeks to explain by example. Indeed, any reading of the whole section confirms that any concurrence with Goldman Sachs' perspective stands in contradiction to every point made under that provision.

Dalal respectfully submits that the throwaway language cannot be considered as part of the binding, contractual terms among the parties, but merely what it says it is: examples only, which seek to illuminate Goldman Sachs's own understanding of the aforementioned three incremental conditions, no more. It is merely throwaway language, specifically cited "by way of example only," and hence not binding on the honorable Arbitrators' plain-English or legal reading of the terms and conditions. To the extent that they are contradictory, the three conditions must stand on their own, but stand they must.

The above point is especially true if the honorable Arbitrators conclude (as Dalal does) that Goldman Sachs' "examples only" are surreptitious attempts to thwart the plain English and contractual reading of those three conditions. Indeed, it is Dalal's belief that Goldman Sachs inserted those three conditions to become compliant with the reasonableness doctrine of New York employment law, and hence to make the terms and conditions of the IPO Award robust and legal. Yet Goldman Sachs then inserted the throwaway language to surreptitiously do away with those same three conditions. While the strategy may superficially convey legal advantage, it renders a contract that the honorable Arbitrators should declare to be too clever by half.

Alternatively, if the contractual terms are construed to give primacy to the "examples only," assuming so for the sake of argument only, they would render

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

the three incremental conditions of Section 4(b)(ii) moot, for the contractual terms would then be no more than what is already covered by the definition of Competitive Enterprise alone. Perhaps Goldman Sachs seeks termination of the IPO Award on a *standalone reading* of the Glossary Of Terms in the Agreement, in which a Competitive Enterprise is defined. Yet no matter Goldman Sachs' perspective, it cannot be the intent of the contract to render Section 4(b)(ii) (or its three incremental conditions) moot.

In summary, to the extent that the throwaway language conflicts with the contractual language, and especially if it is pertinent to the arbitration at hand, it must be forced to recede. Applying well-established principles of contract construction, *the aforementioned three requirements should prevail, not the conflicting "examples" cited by Goldman Sachs (none of which apply to Dalal in any event).* Furthermore, conflict among the key provisions of the contract should be resolved in favor of Dalal and against the party that drafted that clause of the contract, per New York law.[20] In other words, *since Goldman Sachs was the sole drafter of the Agreement, any ambiguity should be resolved against it and in favor of Dalal.*

*Argument VI:*
*Goldman Sachs' Termination Of IPO Award Violates New York Law*
*As Applicable To Forfeiture-For-Competition Agreements*

Summary Of Argument VI

Even if one were to hypothetically assume that the aforementioned arguments all fail (doing so here for the sake of argument only), termination of the IPO Award cannot stand for three interrelated reasons, relating to its non-compete feature.

- First, the *termination constituted a backdoor and backdated non-compete agreement,* contradicting the IPO Award's own description of itself. Based on written terms and conditions provided to Dalal at the time of the IPO Award, there was *no* requirement for him to remain employed at Goldman Sachs or to perform services for the company in the future to enjoy the benefits of the IPO Award. That point has already been detailed.

- Second, the broad and audacious application of the concept of Competitive Enterprise by Goldman Sachs can only be understood as an attempt to

---

[20] New York law construes ambiguous provisions against the party that drafted them. *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 663 (2d Cir. 1996). Goldman Sachs was the sole drafter of the SPA. Thus, to the extent there is any ambiguity, that ambiguity must be resolved against Goldman Sachs and in Dalal's favor. *See Photopaint Technologies, LLC v. Smartlens Corp.,* 335 F.3d 152, 161 (2d Cir. 2003).

prevent Dalal from working in *any* line of business in which he is likely to find employment. Thus the termination transformed the IPO Award into a non-compete agreement, one that was *unrestricted* in its scope, and hence illegal, for it violated the 'reasonableness doctrine' applicable under New York law.

- Third, even if the first two points are hypothetically assumed to permit an unrestricted and unreasonable non-compete agreement, it remains certain, clear and incontrovertible that under New York law such a non-compete must be compensated, which was not done.[21] The value of the IPO Award, even before it was taken away, by no means equaled fair wages for Dalal over the three years that Goldman Sachs sought to enforce no competition. So whether or not that *de facto* non-compete agreement was intended by the parties, agreed to beforehand or permitted by the terms and conditions of the IPO Award, the absence of just compensation (in cash or stock) and of employee choice makes the company's interpretations and conclusions stand in *violation of New York law*.

Also, the context of this case has to be seen in the light of the following statements made by Goldman Sachs, all points already mentioned. First, the documents clarified that the grants had been made for past work at Goldman Sachs. Second, the chief executive officer of Goldman Sachs wrote in a firm-wide letter to all employees that the awards constituted rewards for what employees had "done for the firm"[22] in the past. Third, Dalal's supervisor stated on at least three separate occasions that Dalal's kind of award was not be contingent on continued employment with Goldman Sachs or affected by employment with another financial institution.

Doctrines Of New York Law Not Met

Goldman Sachs' termination violates the 'reasonableness doctrine' that must be applied when considering the validity of non-compete agreements under New York law.[23] It cannot be reasonable in terms of duration, geography or scope that Core Capital is a Competitive Enterprise to Goldman Sachs. The *de facto* non-

---

[21] Whether at market wages, whether in cash or in kind (be it in stock or in the form of employment (pursuant to the 'employee choice doctrine' applicable under New York law)

[22] Goldman Sachs letter dated April 1999 (no day specified) to all employees from the top management of Goldman Sachs, included as Exhibit D.

[23] Under New York law, for the non-compete to be enforceable, the restrictive covenants or conditions must be reasonable. Consider BDO Seidman v. Hirshberg, 690 N.Y.S.2d 854, 856-57 (1999) and Post v. Merrill Lynch, Pierce, Fenner & Smith, 421 N.Y.S.2d 947, 848 (1979). Reasonableness is usually determined in terms of duration, geography or scope of activities, presumably the legal reason why Goldman Sachs included three incremental hurdles under Section 4(b)(ii).

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

compete agreement, which is what the IPO Award becomes if one concurs with Goldman Sachs point of view, is thus fatally flawed.

To concur with Goldman Sachs' broad and audacious reasoning, one must contend that Dalal cannot work in precisely those occupations in economics and finance in which he trained since 1984 through 1999. Dalal's generalized skills in economics and finance cannot be exclusively claimed one employer for its own benefit, but an accumulation of Dalal's prior education and experiences, given that Dalal had earned a bachelor's degree in economics from the University Of Delhi in India, a master's degree in international finance from Columbia University in New York and a master's degree in business administration from Harvard University in Boston, as well as worked for three years at Lehman Brothers in New York (where he received an offer to become an Associate two years before Goldman Sachs made the same offer). Dalal thus possessed a proficiency in finance that was independent of Dalal's tenure at Goldman Sachs.

In other words, Goldman Sachs' apparent contention that Dalal cannot work in any field of finance outside of Goldman Sachs *de facto* makes the IPO Award contingent on employment at Goldman Sachs (which violates express oral and written assurances made to him) or on remaining unemployed without market wages (which would violate general rights).

Anticipating this problem, Goldman Sachs correctly introduced three incremental hurdles within Section 4(b)(ii), to make it reasonable, except that its interpretation of that section, whether on a standalone read of Competitive Enterprise or a focus on the throwaway language alone, then sidesteps those very same three terms.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

Second, Goldman Sachs cannot claim an exemption from the reasonableness doctrine under the 'employee choice doctrine,' when the employee and employer operate from a freedom of choice, and have an ongoing reciprocal obligation between them, in which case the reasonableness of the non-compete may be relegated or become secondary. In other words, when the employee has a choice as to whether he or she will earn a living by competing and forgoing benefits, the length, scope and breadth of the restrictions become less important. Recent case law strengthened the employee choice exemption, which conversely, strengthened the argument that when employee choice is not available, the reasonableness doctrine becomes paramount.[24]

*Argument VII:*
*Goldman Sachs Breached Covenant Of Good Faith And Fair Dealing*

The termination of the IPO Award constitutes a breach of the covenant of good faith and fair dealing implicit in all contracting. Even if one were to concur with Goldman Sachs' twisted and tortuous reasoning, or hypothetically ignore both oral and written contracts, or hypothetically ignore conflicting contractual terms, the company has a good faith obligation to adhere to its contractual commitments. Having worked as the principle associate on seven out of nine revenue generating transactions in his last twelve months (with the other two transactions distributed across the other thirty associates), and having hired Dalal in 1996 away from lucrative opportunities, there was a good faith obligation not to fail to compensate him at the time when over twenty billion was distributed across employees at the time of the IPO. Certainly there is an obligation of good faith and fair dealing incumbent upon Goldman Sachs to adhere to truth-in-advertising and truth-in-labeling of the IPO Award as one for *past* services and not contingent on future employment, and to adhere to the preamble of its *IPO Award Summary,* even if the contractual terms are narrowly assumed to stand in its favor.

In summary, *Goldman Sachs has a good faith obligation to adhere to its oral and written contracts, as well as to adhere to the letter and the spirit of the award made to employees for their (past) contribution toward what turned out to be the company's successful IPO.*

---

[24] Post v. Merrill Lynch, Pierce, Fenner & Smith, 421 N.Y.S.2d 947, 848 (1979). Further, consider that in Lucente v. International Business Machines Corp., 310 F3d 243 2d Cir. 2002, the US Court Of Appeals For The Second Circuit reversed the trial court's refusal, as a matter of law, to enforce IBM's forfeiture-for-competition provision, a case that is pertinent because Goldman Sachs' termination of the IPO Award is in this context a forfeiture-for-competition context. By insisting on the applicability of employee choice doctrine, the Second Circuit's decision clearly clarifies that the employer must have given the employee a choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture).

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

*Argument VIII:*
*Goldman Sachs' Actions Created A Quantum Meruit Claim*

Even if all the other arguments are hypothetically assumed to fail (doing so here for the sake of argument only), the termination of the IPO Award left Dalal with no compensation for exceptionally good work performed during nine months of fiscal year 1999. As a result of Goldman Sachs' contradictory actions, and breach of oral and written contracts and assurances, Dalal was denied the fruit of his labor. Dalal was not able to seek specific contingent recompense from the company or his new employer with regard to the economic loss caused by a prospective termination of the IPO Award. In light of the fact that the IPO Award was ascribed to past services already performed and assurances made by a partner of Goldman Sachs and member of its Commitment Committee, Dalal was rest assured of his retention rights to the IPO Award.

He was the principle associate on seven out of nine revenue generating transactions in his last twelve months (with the other two transactions distributed across the other thirty associates). So Dalal's executed virtually *all* the revenue-generating projects completed by the Leveraged Finance Group that year. Promising him retention of the IPO Award post-departure was clearly set forth as an incentive for Dalal to forfeit his just compensation. The quantum meruit claim is by itself far in excess of the IPO Award's current value, being entitled to a quantum meruit claim of $375,000 for the fiscal year 1999 ($450,000 less what he was paid in salary). The amount is calculated on the basis of a written job offer he received from a competing investment bank (included here as Exhibit N). In then terminating the IPO Award, Dalal was denied the fruits of his labor and the benefit of his bargain.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## SUMMARY OF ISSUES

There are six key questions that are pertinent to clarifying the contractual controversy at hand, none of which can be answered affirmatively in favor of Goldman Sachs, in any reasoned analysis. Dalal respectfully submits the following six questions to distill and summarize the eight arguments already set forth before (but not to substitute them).

1.    Is Dalal's IPO Award contingent on continued employment with or future service to Goldman Sachs?
   - The answer is unarguably no, as stated in several documents

2.    If Dalal's IPO Award is not contingent on continued employment with Goldman Sachs, can it be contingent on not accepting employment with anyone at all?
   - The answer is unarguable no, especially for reasons of reasonableness

3.    If Dalal's IPO Award permits him to accept alternative employment, does can it prohibit him to work with *any* and *all* Competitive Enterprises?
   - The answer is unarguably no, otherwise the three additional hurdles set forth in Section 4(b)(ii) of the Agreement would be moot

4.    Does the termination of Dalal's IPO Award fulfill the first, *necessary* condition under Section 4(b)(ii) of the Agreement—that Core Capital and/or India.com constitute a Competitive Enterprise?
   - The answer is unarguably no, for reasons set forth already

5.    Does the termination of Dalal's IPO Award fulfill the *sufficient* conditions of Section 4(b)(ii) of the Agreement—that Dalal's employment at Core Capital Partners or India.com constitute work that was "similar or substantially related" or work for which Dalal had "supervisory responsibility" or work that called for the "same or specialized skills" as work performed in the last twelve months of Dalal's tenure at Goldman Sachs?
   - The answer is unarguably no, for all good reasons detailed

6.    Even if questions 1 through 5 are hypothetically answered in the affirmative, is it consistent with the laws of New York to surreptitiously apply an IPO Award, made for *past* service, toward a non-compete provision on future employment, without adherence to the doctrines of reasonableness or employee choice?
   - The answer is unarguably no

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

## REMEDIES SOUGHT

Dalal respectfully requests the honorable Arbitrators for a reasoned decision. Dalal also respectfully seeks the following remedies from Goldman Sachs.

- *Make-whole Recompense In Amount Of IPO Award:* First, an award the greater of cash in the amount of $234,000 or stock of Goldman Sachs in the amount of 2,123 shares, as was due to Dalal prior to termination of the IPO Award.[25] The cash amount of $234,000 reflects prices at which Dalal could have sold his shares but for Goldman Sachs' improper and intentional intransigence between June 2000 and January 2002.[26] Any ambiguity as to whether or not Dalal would have or could have or should have sold his shares at higher prices than currently available must be settled in favor of the party that had been harmed, a well-established principle of New York law.

  Alternatively, if the honorable Arbitrators find in favor of Dalal only with respect to Argument VIII, the Quantum Meruit Claim, Dalal seeks cash in the amount of $375,000, which represents his market wages for 1999 (as reflected by an offer letter from a competing investment bank in Exhibit N) less what Goldman Sachs paid him for that year.

- *Reinstitution Of Full Benefit Of Bargain:* Second, Dalal respectfully requests not only recompense of the IPO Award but reinstitution of the *full* benefit of his bargain. So in addition to the above amount, Dalal seeks no less than $375,000 in cash for being denied the benefit of his bargain with Goldman Sachs. Although the amount reflects Dalal's market wages for 1999 less what Goldman Sachs paid him for that year, it is distinct, separate and incremental to the aforementioned quantum meruit claim. Instead, it is a claim for bonus

---

[25] Dalal seeks cash compensation for each tranche of deliverable stock calculable as the difference between what the stock trades on the date of the arbitration award and the maximum price that was available to Dalal post-delivery.

- On the first anniversary of the IPO, 707 shares of stock of Goldman Sachs were deliverable to Dalal. On that date, Goldman Sachs' stock closed at $90.20 per share. For the first tranche deliverable in May 2000, the highest price recorded on the stock was $129.62 per share on September 1, 2000.

- On the second anniversary of the IPO, 708 shares of stock of were deliverable to Dalal. On that date, Goldman Sachs' stock closed at $97.20 per share. For the second tranche deliverable in May 2001, the highest price recorded on the stock was $103.29 per share on May 22, 2001.

- On the third anniversary of the IPO, 708 shares of stock of were deliverable to Dalal. On that date (specifically the prior trading day as the market was closed), Goldman Sachs' stock closed at $78.55 per share. For the third tranche deliverable in May 2002, the highest price recorded on the stock is $97.94 on December 26, 2003.

[26] Although the calculation of the amount is enclosed above, Dalal reserves the opportunity to submit an updated calculation of damages closer to a reasoned, written decision by the NYSE, to reflect any improvement in Goldman Sachs stock price.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

that was earned but which Dalal had given up as part of his bargain with Goldman Sachs.

Dalal worked nine months of fiscal year 1999 in virtually all the revenue generating transactions at his group. For his honest hard work, Dalal was owed not only the IPO Award but an additional big bonus as well, having executed seven of the nine revenue-generating transactions within a seventy-person group. Despite being one of the most productive associates in the whole company, Dalal gave up the bonus on the written and oral understanding that he would retain the IPO Award. It was in of itself a settlement of sorts, a 50-50 arrangement so to speak. Yet Goldman Sachs did not keep its contractual or good faith obligation to let go the modest and smaller amount of the IPO Award, failed to honor its end of the bargain, and denied Dalal the benefit of his bargain.

On Dalal's side, arbitration is not an easy matter, one that he undertakes after years of agonizing. To be forced to undertake a painful and prolonged pursuit of his dues therefore denied Dalal the benefit of his bargain. Given Goldman Sachs' blatant refusal to budge with regard to its breaches, and its improper and intentional intransigence, it is only fair for Dalal to respectfully request not only recompense of the IPO Award but reinstitution of the full benefit of his bargain.

- *Punitive Damages*: Third, Dalal seeks punitive damages as the honorable Arbitrators deem fit. First and foremost, there is a strong public interest for punitive damages. As the honorable Arbitrators may know, less than two hundred senior managers of Goldman Sachs overnight shared over twenty billion dollars from an initial public offering of the company. By contrast, the same managers, enriched by good fortune, sought to deny Dalal the fruits of his honest hard work, not a fortune, just market wages in the business. Despite their own wondrous windfall, Goldman Sachs sought to knowingly and inappropriately takeaway Dalal's small award, leaving him no alternative to recover his dues except to put his reputation at risk and seek arbitration. The public interest is especially intensified by the fact that Goldman Sachs was reminded by Dalal about the context of his departure through several letters as attached. Yet it has shown an intentional and improper disregard for the facts of the case. Even worse, it is clear and incontrovertible that Goldman Sachs denies employee dues as a standard operating procedure.

CONFIDENTIAL PER AGREEMENT AMONG PARTIES

The above facts strongly suggest a public interest in award of punitive damages. The agreement among the parties permits such a punitive award.[27] Recent case law also permits such a punitive award.[28] Punitive damages are consistent with the NASD rules of fair practice.[29]

- *Miscellaneous Costs And Fees*: Fourth, Dalal seeks costs, legal fees and interest from Goldman Sachs, as well as any other further relief that the honorable Arbitrators deem just and proper.[30]

Dated October 11, 2004

Sincerely,

Signed For Self
Sandeep Dalal  Claimant
Resident At Address Listed Above

---

[27] The parties did not explicitly agree to exclude the award of punitive damages from arbitration, and it is implicit in the agreement that punitive damages are subject to arbitration.

[28] Supreme Court stated in Mastrobuono v. Shearson Lehman Hutton, Inc., 1995 WL 86555 (March 6,1995) that New York choice of law common to many customer agreements was ambiguous and therefore it only included New York's substantive and not its procedural provisions, holding that "in the absence of contractual intent to the contrary, the FAA would preempt the Garrity rule."

[29] Article III Section 21(f) of the NASD Rules of Fair Practice.

[30] Dalal will submit legal fees and expenses incurred at the end of the arbitration process.

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-2191 | Fax: 212-428-1027 | e-mail: carol.cortorillo@gs.com

Carol A. Cortorillo
Vice President
Human Resources

**Goldman
Sachs**

June 5, 2000

Mr. Sandeep Dalal
2111 Wisconsin Ave Apt. #208
Washington, WA  20007

Re: Termination of IPO Award

Dear Mr. Dalal,

As you are aware, pursuant to Paragraph 4(b)(ii) of the 1999 Formula RSU Award Agreement, your rights in respect of any outstanding Restricted Stock Units ("RSUs") shall immediately terminate, and no shares shall be delivered in respect of such RSUs if, prior to the relevant delivery date, you engage in any competitive activity.

This letter is to inform you that the administrative committee of the Goldman Sachs 1999 Stock Incentive Plan (the "SIP Committee") determined, based on information, including information you provided in your Certification Form regarding your professional activity after leaving Goldman Sachs, that you have engaged in the competitive activity described in Paragraph 4(b)(ii) of your RSU Agreement.  Accordingly, all of your rights in respect of your 2,123 Formula RSUs terminated as of June 2, 2000, and no shares will be delivered in respect of those RSUs.

If you believe that there are additional facts of which the SIP Committee was not aware that would support a conclusion that you have not engaged in the competitive activity described in Paragraph 4(b)(ii) of your RSU Agreement, you should provide us with a detailed written discussion of these facts.  This discussion should include a detailed description of all of your positions and all of your duties at all of your professional associations since leaving Goldman Sachs and should discuss with specificity why you believe that, in light of those duties and the nature of your professional association and the enterprises with which you are or were associated, you have not engaged in the competitive activity described in Paragraph 4(b)(ii).  In addition, you must provide a telephone number and contact name (along with a brief statement of who the contact person is) for each employment or other professional activity.  Through your Certification Form, you have already provided us with permission to speak with your current employer or make other inquiries necessary to confirm your equity award certifications.  You should send any request for reconsideration to the attention of the Stock Plan Group, 85 Broad St., 3rd Floor, New York, NY 10004.

In addition, if you have any questions regarding this decision please contact Alan Wilmit at (212) 357-3284 or Kevin Whitney at (212) 902-0611 in the Legal Department.

Sincerely,

Carol A. Cortorillo

The Observatory of Georgetown, Apt. 208
2111 Wisconsin Avenue, NW
Washington, DC 20007
202-329-7534
sdalal@mba1996.hbs.edu

October 16, 2000

Ms. Carol A. Cortorillo
Vice President
Human Resources
Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004

Dear Ms. Cortorillo,

I am in receipt of your letter dated June 5, 2000, which I read only today as I have been out of the country for several months and only my office mail was being forwarded to me. Please excuse any inconvenience this delay may have caused you.

### Introduction

I hold Goldman Sachs in the highest regard, and it is in this context that I respectfully disagree with the decision by the administrative committee to not deliver any shares with respect to the June 2000 RSUs. The context in which my RSU award was made, including personal and email conversations in the period from Thursday, April 8th, 2000 to my departure on August 27th, 2000, are very important to this context. While I will be glad to provide any information that may help clarify the circumstances in which my RSU award was made, it is relevant at this stage to respond to your request to provide additional information to the committee on my activities to date.

I emphasize to the firm that I am not engaged, or have in the past engaged, in an activity competitive with the businesses of Goldman Sachs, but to the contrary have sought to refer to senior bankers and friends any business of potential interest to the firm.

### India.com

I am currently President and Head of North American Operations for India.com, a company that seeks to become the leading supplier of Internet and business products and services in India. The Company's core business strategy is to leverage the power of the Internet to bring Indian businesses online and to supply complimentary services and products to those businesses. In addition, India.com will launch a comprehensive portal later this year that will focus on compelling content and commerce functionality for the Indian Diaspora.

My current role is not competitive to the activities of Goldman Sachs, and 4(b)(ii) should not be applied for the following reasons:

    (1) the company is engaged in activities different from Goldman Sachs and it is not a "Competitive Enterprise," so 4(b)(ii)(A) should not be applied,

    (2) I do not "manage or supervise personnel engaged in" activities I had previously participated in while at Goldman (leveraged finance), so 4(b)(iii)(B) should not be applied generally,

    (3) my role within the company is broad, but there is no application of skills learned or use of any activities I participated in while at Goldman to any of my current responsibilities and I gained no exposure to India or Indian clients while at Goldman Sachs or to the Internet or technology sector, so 4(b)(ii)(B)(1)(2) or (3) should not be applied.

    (4) Once again, I wish to also point out my prior extensive work experience in M&A and IPOs at Lehman Brothers, consulting at Bain and two graduate degrees in finance, versus my work in leveraged finance while at Goldman. The former are skill sets that, if utilized in my current work, are not within the purview of Goldman seeking to protect its intellectual property or can be subsumed by the RSU Award Agreement.

Instead of being a competitive enterprise, India.com is a strong potential client of Goldman Sachs. Additionally, I am glad to pass along any leads or references relevant to your business to Goldman's newly recruited India Investment Banking team. For example, the two new hires for India are known to me—one was at the same firm for two years and the other was at the same high school in India. These are in addition to the various technology and Asia professionals I have come to know over three years at the firm. Finally, I was recently introduced to Goldman's research team in Asia to begin the process of introducing our business to Goldman, to potentially work together for an IPO next year.

**Core Capital Partners**

Prior to joining India.com, I was at Core Capital Partners as Vice President. Core is a Small Business Investment Corporation, with $60 million of equity and $100 million of capital licensed to it by the Small Business Administration. Unlike some older SBICs, Core does not manage multiple pools of private equity but only operates the SBIC. The fund focuses on information technology, and technology-impacted companies, the communications industry and the business services sector. All investments made while I was there were made under the regulations of the SBA Lending Guidelines.

My role while at Core Capital was not competitive to the activities of Goldman Sachs, and 4(b)(ii) should not be applied for the following reasons:

    (1) the company (unlike Goldman) made investments under SBA regulations, which are onerous and require investments in "small companies" only, i.e. companies with less than $18 million in net worth and $6 million in net

income, and thus preclude a private equity player of the size of Goldman Sachs' $5 billion+ fund being a participant in Core's market or making Core a "Competitive Enterprise" (in fact the size of our $60 million fund is equal to the likely average single Goldman investment), so 4(b)(ii)(A) should not be applied,

(2) I did not "manage or supervise personnel engaged in" activities I had previously participated in while at Goldman (leveraged finance), so 4(b)(iii)(B) should not be applied generally,

(3) my role at Core generally encompassed private equity investing which required skills in areas of deal sourcing, industry analysis, valuation analysis, due diligence and legal drafting specific to private equity investments. Each of these processes is distinctly different from the high yield markets. To illustrate this point, warrants are not de-minimus in private equity, the stock purchase agreement is totally different from bond indentures, the due diligence process for private equity focuses on upside and not downside, and so on and so forth. Goldman and other investment banks acknowledge the very specific specialization that characterizes the leveraged finance field in the pattern of hiring professionals as well. Further, while leveraged finance is a very democratic market, the deals we invested in during my employment at Core were too small to reasonably expect me to utilize knowledge of the leveraged finance world. Finally, while at Goldman, my "activities" provided me no exposure to the Internet and IT sectors which became the bulk of my work at Core Capital, so 4(b)(ii)(B)(1),(2) or (3) should not be applied.

(4) Once again, I wish to also point out my prior extensive work experience in M&A and IPOs at Lehman Brothers, consulting at Bain and two graduate degrees in finance, versus my work in leveraged finance while at Goldman. The former are skill sets that, if utilized in my current work, are not within the purview of Goldman seeking to protect its intellectual property or can be subsumed by the RSU Award Agreement.

## Support for Goldman

At every available opportunity, I have provided leads that may be of interest to Goldman's investment banking area and more importantly, to the private equity group. Much of the deal flow that I have passed onto Goldman was deemed as being "too small" or "too early stage," while these deals were too big for us. The fact that I am always speaking highly of Goldman and referring private equity deals to its professionals evidences the regard in which I hold Goldman as a firm and perhaps the most honest way to demonstrate that 4(b)(ii) is not applicable to my context.

I will be glad to provide any additional information that may be helpful to your evaluation process. If required, please feel free to contact me via mail or email mentioned above or call me on my US mobile phone at 202-329-7534. I look

forward to your response and to the opportunity to work with various areas of Goldman in the future.

Sincerely,


Sandeep Dalal

Cc:    Mr. John Townsend

UNSIGNED COPY ON FILE

EXHIBIT F:   GOLDMAN RESPONSE TO REQUEST FOR MODIFICATION

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

February 22, 2006

By Facsimile

Mr. David Carey,
    NYSE Arbitration Department,
        20 Broad Street,
            Fifth Floor,
                New York, NY 10005.

Re:    *Dalal v. Goldman, Sachs & Co.;* No. 2004-015821

Dear Mr. Carey:

I write on behalf of Goldman, Sachs & Co. to oppose Mr. Dalal's application for a revision of the Panel's award. As Mr. Dalal expressly acknowledged at the hearing, he had a full opportunity to present his case. Mr. Dalal's application, which consists of nothing more than arguments he made at the hearing, offers no basis whatsoever for modification of the Award. Mr. Dalal's application should be dismissed.

Very truly yours,

Robin D. Fessel

cc:    Sandeep Dalal